Case No:

# 18 U.S.C 1964 - Complaint - Eastern District of Wisconsin - Milwaukee Wi - case code 470

William Louis Armstrong. And. United States

2580 S 34th St, Milwaukee Wi, 53215. Involuntary plaintiff. Government body.

Plaintiff. Individual in his personal capacity.

vs.

Alter Trading Corporation
700 Office Parkway
Saint Louis, Missouri, 63141
Defendant. Personal capacity, Body corporate. Missouri Corporation.
And
Seven Stars Auto Parts LLC
3520 W Mill Rd, Milwaukee, WI 53209.
Defendant. Personal capacity. Body corporate. Wisconsin LLC.
And
Miller Compressing Company
1900 W Bruce St, Milwaukee, WI 53204
Defendant. Personal capacity. Body corporate. Wisconsin Corporation.
And
Chanel
Defendant. Personal capacity. Individual.
And
Jon Spigel
1614 E Kenmore Pl
Milwaukee, Wisconsin, 53211
Defendant. Personal capacity. Individual.
And
Michael Goldstein
700 Office Parkway, St. Louis, Missouri
Defendant. Personal capacity. Individual.
And
Robert Goldstein
700 Office Parkway
St. Louis, Missouri 63141
Defendant. Personal capacity. Individual.
And

Goldstein Group Inc
Defendant. Personal capacity. Body Corporate.
And
Robert G. Ellis
12121 Hibler Dr, Saint Louis, MO 63141
Defendant. Personal capacity. Individual.
And
Quarles & Brady LLP
Defendant. Personal Capacity. Body Corporate. I think a Wisconsin company.
411 E Wisconsin Ave # 2400, Milwaukee, WI 53202
And
Alter Logistics & Transloading company
Defendant. Personal Capacity. Body Corporate. I think it's an Iowa corporation.
2117 State St, Bettendorf, IA 52722
And
MCC HOLDING INC,
Address unknown.
Defendant. Personal capacity. LLC.
And
John Busby
1004 East Ogden Ave., Milwaukee, WI 53202
Defendant. Personal capacity. Individual.
And
All Seasons Trucking 2 LLC
1410 ELLIS ST, STE B, WAUKESHA , WI 53186-5621
Defendant. Personal capacity. Body Corporate. Wisconsin LLC.

1

And
Toyota Motor Corporation
Defendant. Body Corporate.
And
Toyota Motor North America
Defendant. Body Corporate.
And
Toyota Motor Sales, USA
Defendant. Body Corporate.
And
Toyota Financial Services.
Defendant. Body Corporate.
And
Toyota Tsusho Corporation
Defendant. Body Corporate.
And
Toyota Tsusho America inc
Defendant. Body Corporate.
And
Altech Recycling LLC
Defendant. Body Corporate.
And
Jeffery Goldstein.
Defendant. Individual.
And
Kathy Goldstein.
Defendant. Individual.
And
Richard Goldstein.
Defendant. Individual.
And

Josh Millan.
Defendant. Individual.
And
Marc Goldstein.
Defendant. individual.
And
Nathan Millan.
Defendant. Individual.
Samantha Goldstein
Defendant. Individual.
Lauren Goldstein.
Defendant. Individual.
Jeremy Goldstein.
Defendant. Individual.
Alex Goldstein.
Defendant. Individual
Jesse Goldstein.
Defendant. Individual.
And
Renee Goldstein.
Defendant. Individual.
And
David Klein
Defendant. Individual.
And
Joseph Poehlmann
Defendant. Individual.
And
United States
Defendant. Government.

# **Introduction**

## **Jurisdiction**

This complaint asserts claims under title 18 U.S.C 1964 (c), and Wisconsin statute 946.87(4).

Federal jurisdiction is under title 28 U.S.C 1331 for federal RICO, and title 28 U.S.C 1367 for the Wisconsin RICO.

## **Limited legal noticing to facilitate screening**

For the courts and the parties' convenience and to facilitate screening of my complaint, on issues of conspiracy I direct attention to *Haroco, Inc. v. Am. Nat'l Bank & Trust Co. of Chicago, 747 F.2d 384, 404 (7th Cir.1984)* and *Ashland Oil, Inc. v. Arnett, 875 F.2d 1271 (7th Cir. 1989)* for supporting claims that RICO reaches intra corporate conspiracies in the 7th circuit. Also see *Denise Travis, Plaintiff-appellee, v. Gary Community Mental Health Center, Inc., et al.,defendants-appellants, 921 F.2d 108 (7th Cir. 1991)* for a contrary result in other statutory contexts, but also directly supporting that applicability of intra-corporate conspiracy doctrine depends on statutory context. I also direct attention to *Lane v. Sharp Packaging Systems, Inc., 248 Wis. 2d 380, 2001 WI App. 250, 635 N.W.2d 896 (Wis. Ct. App. 2001)*, to support claims of actionable conspiracy between attorneys and clients, at least insofar as Wisconsin state law provides the rule of decision, in respect to each claim but at a minimum for the Wisconsin RICO.

On an issue of whether subsequent predicate acts can establish a pattern for the purposes of an earlier injury, *McCool v. Strata Oil Co., 972 F.2d 1452 (7th Cir. 1992)* supports the affirmative..

On an issue of the meaning of the word income as used in title 18 U.S.C section 1962 (a), I point to ***Moore v. United States, 602 U.S. 572 (2024)***, where the federal government argued that the word "income" in the constitutional sense includes unrealized gains, which implicates the meaning of the word income in the RICO context. Particularly persuasive in my view was the part in the government's merits brief which read "Thus, a leading economist of the era defined income as "the money value of the net accretion to one's economic power between two points in time." Robert Murray Haig, The Federal Income Tax 7 (1921) (emphasis omitted) (Haig). That definition, Professor Haig explained, was "the one generally adopted as the definition of income in modern income tax acts," ibid., and it remains "the most widely accepted" definition among economists and tax experts, Boris I. Bittker & Lawrence Lokken, Federal Taxation of Income, Estates, and Gifts   3.1.1, 3-2 (3d ed. 1999)."

On an issue of what it means to receive income I point to ***Maryland Cas. Co. v. United States, 251 U.S. 342 (1920)*** which says "**in the popular or generally accepted meaning of the words, "received by it" (which must be given to them, Maillard v.Lawrence, 16 How. 251), receipt by an agent is regarded as receipt by his principal**", which informs the meaning of the word "received" in title 18 section 1962 (a). This supports claims that a number of defendants received income through subsidiaries acting in fact as multiple-agents simultaneously for various principals. If anything the term "**any** income derived, **directly or indirectly**," in title 18 section 1962 (a) is more broad than the language construed in Maryland. This isn't vicarious liability, it informs the scope of the word "received", where receiving income through an agent is a direct violation by the principal who is culpable on account of their own receipt and use.

3

# Pleading the violations - Legal pleadings from statutes;

All necessary inferences to support the legal pleadings can be drawn from the pleadings of predicate the acts. Furthermore, more specific allegations in support of these legal pleadings are shown non-exhaustively near the bottom in the supplement to legal pleadings section which may facilitate expedited screening for allowing discovery to perpetuate testimony, which I request.

## Title 18 section 1962 (a) -All defendant's

Alter Trading Corporation having received income from a pattern of racketeering activity in which they participated as a principal within the meaning of title 18 section 2, used and invested some of that income, in the operation of an enterprise the activities of which affect interstate commerce, **in violation of title 18 U.S.C section 1961 (a).** In doing so, they caused injury to William Armstrong's property and business as described in this complaint and as will be shown by the evidence.

Goldstein Group INC, Miller Compressing Company, Seven Stars Auto Parts LLC, Alter Logistics & Transloading company, Quarles & Brady LLP, All Seasons Trucking 2 LLC, Chanel, Robert Goldstein, Michael Goldstein, Robert G. Ellis, and Jon Spigel, having each received income from a pattern of racketeering activity in which each defendant had participated in as a principal within the meaning of title 18 section 2, each defendant used and invested some of that income, in the operation of an enterprise the activities of which affect interstate

4

commerce, **in violation of title 18 U.S.C section 1961 (a)**. In doing so, they caused injury to William Armstrong's property and business as described in this complaint and as will be shown by the evidence.

## Title 18 section 1962 (d) with respect to subsection (a) - All defendant's

Goldstein Group INC, Alter Trading Corporation, Miller Compressing Company, Seven Stars Auto Parts LLC, Alter Logistics & Transloading company,  Quarles & Brady LLP, All Seasons Trucking 2 LLC, Chanel,  Robert Goldstein, Michael Goldstein, Robert G. Ellis, Jon Spigel, conspired for Alter Trading Corporation to receive income from a pattern of racketeering activity that Alter Trading Corporation had participated in as a principal, and for Alter Trading Corporation to use or invest some part of that income in the operation of an enterprise the activities of which affect interstate commerce, **in violation of title 18 U.S.C section 1961 (d) with respect to subsection (a)**. In doing so, they caused injury to the plaintiff's property and business as otherwise described in this complaint and as will be shown by the evidence.

In the alternative the conspiracy was for Goldstein Group INC, Miller Compressing Company, Seven Stars Auto Parts LLC, Alter Logistics & Transloading company,  Quarles & Brady LLP, All Seasons Trucking 2 LLC, Chanel,  Robert Goldstein, Michael Goldstein, Robert G. Ellis, or Jon Spigel to receive income from a pattern of racketeering activity that each defendant respectively as applicable had participated in as a principal, and for each defendant respectively as applicable to use or invest some part of that income in the operation of an enterprise the activities of which affect interstate commerce, **in violation of title 18 U.S.C section 1961 (d)**

5

**with respect to subsection (a),** which similarly caused injury to the plaintiff's property and business as described in this complaint and as will be shown by the evidence.

## Title 18 section 1962 (b) - All defendant's

Alter Trading Corporation through a pattern of racketeering activity did both acquire and maintain, both directly and indirectly, both interests and control, over various enterprises, which were engaged in, and the activities of which affected, both interstate and foreign commerce, **in violation of title 18 U.S.C section 1962 (b).** In doing so, they caused injury to William Armstrong's property and business as described in this complaint and as will be shown by the evidence.

Goldstein Group INC, Miller Compressing Company, Seven Stars Auto Parts LLC, Alter Logistics & Transloading company, Quarles & Brady LLP, All Seasons Trucking 2 LLC, Chanel, Robert Goldstein, Michael Goldstein, Robert G. Ellis, and Jon Spigel, each separately, through a pattern of racketeering activity did both acquire and maintain, both directly and indirectly, both interests and control, over various enterprises, which were engaged in, and the activities of which affected, both interstate and foreign commerce, **in violation of title 18 U.S.C section 1962 (b).** In doing so, they caused injury to William Armstrong's property and business as described in this complaint and as will be shown by the evidence.

The relevant enterprises for purposes of the allegations under subsection (b) and subsection (d) with respect to (b) include without limitation, the various defendants themselves, any number of

6

the various defendants together in any combination, any victims of their crimes including natural persons and businesses and including specifically William Armstrong and his sole proprietorship, etc.,

At a minimum, Goldstein group INC directly or indirectly acquired interests in and control over Miller Compressing through conduct including procurement of unlicensed money transmitting. Alter Trading Corporation directly or indirectly acquired interests in and control over Miller Compressing Company by conduct including unlicensed money transmitting. Goldstein Group INC, Alter Trading Corporation, Miller Compressing Company, Seven Stars Auto Parts LLC, Robert Goldstein, and Michael Goldstein, acquired and maintained interests in and control over William Armstrong's sole proprietorship through conduct including possession of Altered vin vehicles, thefts, criminal slander of title, etc

## Title 18 section 1962 (d) with respect to subsection (b) - All defendant's

Goldstein Group INC, Alter Trading Corporation, Miller Compressing Company, Seven Stars Auto Parts LLC, Alter Logistics & Transloading company, Quarles & Brady LLP, All Seasons Trucking 2 LLC, Chanel, Robert Goldstein, Michael Goldstein, Robert G. Ellis, Jon Spigel, conspired for Alter Trading Corporation through a pattern of racketeering activity to either acquire or maintain, either directly or indirectly, either interests or control, over any number of enterprises, which were engaged in, and the activities of which affected, both interstate and foreign commerce, **in violation of title 18 U.S.C section 1962 (d) with respect to subsection (b).** In doing so, they caused injury to William Armstrong's property and business as described in this complaint and as will be shown by the evidence.

7

In the alternative the conspiracy was for either Goldstein Group INC, Miller Compressing Company, Seven Stars Auto Parts LLC, Alter Logistics & Transloading company, Quarles & Brady LLP, All Seasons Trucking 2 LLC, Chanel, Robert Goldstein, Michael Goldstein, Robert G. Ellis, or Jon Spigel, through a pattern of racketeering activity, to either acquire or maintain, either directly or indirectly, either interests or control, over any number of enterprises, which were engaged in, and the activities of which affected, both interstate and foreign commerce, **in violation of title 18 U.S.C section 1962 (d) with respect to subsection (b).** In doing so, they caused injury to William Armstrong's property and business as described in this complaint and as will be shown by the evidence.

### Title 18 section 1962 (c) - All defendant's

Alter Trading Corporation, being employed by or associated with various enterprises, the activities of which affected interstate or foreign commerce, did both conduct and participate, both directly and indirectly, in the conduct of those enterprises' affairs through a pattern of racketeering activity, **in violation of title 18 U.S.C section 1962 (c).** In doing so, they caused injury to William Armstrong's property and business as described in this complaint and as will be shown by the evidence.

Goldstein Group INC, Miller Compressing Company, Seven Stars Auto Parts LLC, Alter Logistics & Transloading company, Quarles & Brady LLP, All Seasons Trucking 2 LLC, Chanel, Robert Goldstein, Michael Goldstein, Robert G. Ellis, and Jon Spigel, each being employed by or associated with various enterprises the activities of which affected interstate or

8

foreign commerce, each did both conduct and participate, both directly and indirectly, in the conduct of those enterprises' affairs through a pattern of racketeering activity, **in violation of title 18 U.S.C section 1962 (c).** In doing so, they caused injury to William Armstrong's property and business as described in this complaint and as will be shown by the evidence.

The relevant enterprises for purposes of these allegations under subsection (c) include without limitation, the various defendants themselves, any number of the various defendants together in any combination, any victims of their crimes including natural persons and businesses and including specifically William Armstrong and his sole proprietorship, the Department of Justice and any programs it maintains together and separately including the NMVTIS, etc.

At a minimum, Goldstein group INC directly or indirectly acquired Miller Compressing through conduct including procurement of unlicensed money transmitting. Alter Trading Corporation directly or indirectly acquired Miller Compressing Company by conduct including unlicensed money transmitting. Goldstein Group INC, Alter Trading Corporation, Miller Compressing Company, Seven Stars Auto Parts LLC, Robert Goldstein, and Michael Goldstein, acquired and maintained interests in and control over William Armstrong's sole proprietorship through conduct including possession of Altered vin vehicles and thefts.

### Title 18 section 1962 (d) with respect to subsection (c) - All defendant's

Goldstein Group INC, Alter Trading Corporation, Miller Compressing Company, Seven Stars Auto Parts LLC, Alter Logistics & Transloading company,  Quarles & Brady LLP, All Seasons Trucking 2 LLC, Chanel,  Robert Goldstein, Michael Goldstein, Robert G. Ellis, Jon Spigel,

9

conspired for Alter Trading Corporation, who was employed by or associated with various enterprises the activities of which affected interstate or foreign commerce, to either conduct or participate, either directly or indirectly, in the conduct of those enterprises' affairs through a pattern of racketeering activity, **in violation of title 18 U.S.C section 1962 (d) with respect to subsection (c).** In doing so, they caused injury to William Armstrong's property and business as described in this complaint and as will be shown by the evidence.

In the alternative the conspiracy was for either Goldstein Group INC, Miller Compressing Company, Seven Stars Auto Parts LLC, Alter Logistics & Transloading company, Quarles & Brady LLP, All Seasons Trucking 2 LLC, Chanel, Robert Goldstein, Michael Goldstein, Robert G. Ellis, or Jon Spigel, who were each employed by or associated with various enterprises the activities of which affected interstate or foreign commerce, to either conduct or participate, either directly or indirectly, in the conduct of those enterprises' affairs through a pattern of racketeering activity, **in violation of title 18 U.S.C section 1962 (d) with respect to subsection (c).** In doing so, they caused injury to William Armstrong's property and business as described in this complaint and as will be shown by the evidence.

## Wisconsin statute 946.83 (1) - All defendant's

Alter Trading Corporation, having received proceeds with knowledge that they were derived directly or indirectly from a pattern of racketeering activity, used or invested directly or indirectly, some part of those proceeds or the proceeds derived from the investment or use thereof, in the operation of an enterprise, **in violation of Wisconsin statute 946.83 (1)**. In doing

10

so they caused injury to the plaintiffs property and business as described in this complaint and as will be shown by the evidence.

Goldstein Group INC, Miller Compressing Company, Seven Stars Auto Parts LLC, Alter Logistics & Transloading company, Quarles & Brady LLP, All Seasons Trucking 2 LLC, Chanel, Robert Goldstein, Michael Goldstein, Robert G. Ellis, and Jon Spigel, each having received proceeds with knowledge that they were derived directly or indirectly from a pattern of racketeering activity, used or invested directly or indirectly, some part of those proceeds or the proceeds derived from the investment or use thereof, in the operation of an enterprise, **in violation of Wisconsin statute 946.83 (1)**. In doing so they caused injury to the plaintiffs property and business as described in this complaint and as will be shown by the evidence.

## Wisconsin statute 946.83 (2) - All defendant's

Alter Trading Corporation through a pattern or racketeering activity did both acquire and maintain, both directly and indirectly, both interests in and control of various enterprises and real properties, **in violation of Wisconsin statute 946.83 (2)**. In doing so, they caused injury to William Armstrong's property and business as described in this complaint and as will be shown by the evidence.

Goldstein Group INC, Miller Compressing Company, Seven Stars Auto Parts LLC, Alter Logistics & Transloading company, Quarles & Brady LLP, All Seasons Trucking 2 LLC, Chanel, Robert Goldstein, Michael Goldstein, Robert G. Ellis, and Jon Spigel, each through a pattern or racketeering activity did both acquire and maintain, both directly and indirectly, both

interests in and control of various enterprises and real properties, **in violation of Wisconsin statute 946.83 (2)**. In doing so, they caused injury to William Armstrong's property and business as described in this complaint and as will be shown by the evidence.

## Wisconsin statute 946.83 (3) - All defendant's

Alter Trading Corporation, being both employed by and associated with various enterprises, did both conduct and participate, both directly and indirectly, in those enterprises through a pattern of racketeering activity, **in violation of Wisconsin statute 946.83 (3).** In doing so, they caused injury to William Armstrong's property and business as described in this complaint and as will be shown by the evidence.

Goldstein Group INC, Miller Compressing Company, Seven Stars Auto Parts LLC, Alter Logistics & Transloading company, Quarles & Brady LLP, All Seasons Trucking 2 LLC, Chanel, Robert Goldstein, Michael Goldstein, Robert G. Ellis, and Jon Spigel, each being both employed by and associated with various enterprises, did both conduct and participate, both directly and indirectly, in those enterprises through a pattern of racketeering activity, **in violation of Wisconsin statute 946.83 (3).** In doing so, they caused injury to William Armstrong's property and business as described in this complaint and as will be shown by the evidence.

## Wisconsin statute 946.85 (1) - Goldstein Group INC, Alter Trading Corporation, Miller Compressing Company, Robert Goldstein

Robert Goldstein, Goldstein Group INC, Alter Trading Corporation, and Miller Compressing

Company, each engaged in prohibited activities under Wisconsin statute 946.83 subsections (1),

(2), and (3), and the activities were undertaken by each specified defendant in concert with five

or more other persons, each of whom acted with intent to commit a crime, and with respect to

whom each specified defendant occupied a supervisory position, and each specified defendant

obtained gross income or resources in excess of $25,000 from such activities, **in violation of**

**Wisconsin statute 946.85 (1)**. In doing so, they caused injury to William Armstrong's property

and business as described in this complaint and as will be shown by the evidence.


# **The pattern of racketeering activity**

### **Title 18 U.S.C. section 1960 "Unlicensed money transmitting, 2012, 2013, 2014, 2015, 2016,**
### **2017, 2018, 2019, 2020"**

In connection with Goldstein Group Inc's and Alter Trading Corporation's acquisition of Miller

Compressing Company in 2012, the company MCC HOLDINGS INC, agreed to act as a money

transmitter for Miller Compressing Company, Alter Trading Corporation, and Jeffery Miller with

respect to an annual payment of $350,000 per year owed by Miller Compressing Company to

Jeffery Miller from the time of the transaction up to or through 2024.


Mcc holdings inc did conduct an unlicensed money transmitting business in connection with the

2012 acquisition of Miller Compressing Company by Goldstein Group INC through and with

Alter Trading Corporation. They operated without an appropriate money transmitting license

from Wisconsin, where a license was then required by 2011 through 2012 Wisconsin statutes

chapter 217.03, because they engaged as a service or for a fee or other consideration in business

as a "seller of checks" where "seller of checks" included a person who engages as a business in receiving money for transmission and / or transmitting money etc

Furthermore, the money transmitting business involved the transmission of funds that were known by MCC HOLDINGS INC to have been derived from criminal offenses including without limitation violations of title 18 section 2321, Wisconsin theft statutes, Wisconsin criminal slander of title statute, and federal monopoly statutes such as title 15 sections 1, 2, and 18, and the money transmissions were otherwise intended to be used to support or promote unlawful activity including without limitation violations of monopoly laws because the acquisition was anticompetitive.

The transaction was structured so as to disguise the nature of the transmitted payments as proceeds of unlawful money transmitting, but as a matter of fact, Mcc Holdings inc was operating as an unlicensed money transmitter in violation of title 18 section 1960. As a factual matter, even if by any other name they were an unlicensed money transmitter.

It's also alleged that Goldstein Group Inc, Alter Trading Corporation, Miller Compressing Company, MCC HOLDING INC, John Busby, Jon Spigel, Robert Goldstein, and Michael Goldstein did aid, abet, induce, procure, and willfully cause the commission of this act in connection with and by way of their direction and participation in the 2012 acquisition of Miller Compressing Company by Alter Trading Corporation.

14

For clarity, Robert Goldstein issued a statement concerning the 2012 acquisition of Miller Compressing Company on September 28th 2012, showing that he was involved as a corporate executive in the acquisition. His son Michael Goldstein had also moved to Milwaukee to facilitate the acquisition. At a minimum Michael Goldstein's involvement in the Miller acquisition was a form of workforce development. I'm alleging that Robert Goldstein wore both his Alter Trading Corporation "hat" and his Goldstein Group Inc hat in the course of his involvement with the acquisition. Certainly workforce development work involved the Goldstein Group Inc hat, in the alternative.

**"Unlicensed money transmitting, 2012, 2013, 2014, 2015, 2016, 2017, 2018, 2019, 2020"
plain and simple**: MCC HOLDINGS inc agreed to act and thereafter did act as an unlicensed money transmitter each year for several years in connection with the 2012 acquisition of Miller Compressing Corporation by Alter Trading Corporation and Goldstein Group INC. Several defendants are culpable for aiding, abetting, procuring, causing, etc.

**Title 18 U.S.C 1343 "Fraudulent transfer wire fraud, 2012, 2013, 2014, 2015, 2016."**
Particularized information regarding the details of these transactions are uniquely in possession of the defendants, but, nonetheless, in connection with the 2012 acquisition of Miller Compressing Corporation by Alter Trading Corporation and the unlicensed money transmitting agreement, MCC HOLDING INC, and John E. Busby, devised a scheme to obtain for SFM marital trust and its beneficiaries and employees a greater portion of the proceeds from the unlicensed money transmitting arrangement than otherwise would have flowed to them without the use of false pretenses. The unlicensed money transmitting arrangement had involved

15

liquidation of Miller Compressing Company stock held by MCC HOLDING, and MCC

HOLDING INC was to regularly transmit money to Jeffery Miller over a number of years in

satisfaction of a debt owed by Miller Compressing Company to Jeffery Miller.

The false pretense was that MCC HOLDING would over the years  pay the outstanding balance

that Miller Compressing Company owed to Jeffery Miller, or at least would pay a greater portion

of such balance than was ultimately paid. Almost immediately following the liquidation of MMC

HOLDING's Miller Compressing Company stock, MCC HOLDING started transferring large

sums of money to SFM marital trust. Between 2012 and 2016 MCC HOLDING transferred over

four million dollars to John E. Busby, SFM marital trust, and George A. Dionisopoulos as trustee

of SFM marital trust. While siphoning that money from MCC HOLDING between 2012 and

2016, John E. Busby and MCC HOLDING made the annual payments under the unlicensed

money transmitting agreement while waiting for MCC HOLDING to eventually become

insolvent as to their obligations for some number of remaining years. In 2021 MCC HOLDING

INC informed Miller Compressing Company that they would not be making the payment

because of insolvency.

So MCC HOLDING INC and John E. Busby by means of  the false pretense that MCC

HOLDING INC would pay the outstanding balance of Miller Compressing Company's debt to

Jeffery Miller, or some portion thereof, obtained additional money on the disposition of MCC

HOLDING INC's Miller Compressing Company stock, or alternatively a greater share of such

income for the benefit of SFM marital trust. Put simply, they said they would assume

responsibility for the debt, but immediately started funneling money out of the company while

allowing the company to become insolvent, and by doing so they paid some number of years less in debt service and put more into their own pockets. Although these predicate acts are backstabbing as between defendants, it's nonetheless part of the larger pattern

## Title 18 U.S.C. section 1956 "2012 Money laundering"

In 2012, Alter Trading Corporation, Miller Compressing Company, Seven Stars Auto Parts LLC, engaged in a transaction whereby assets were transferred between defendant business entities, which generally will be referred to as the acquisition of Miller Compressing Company. That transaction was a financial transaction. Each of these parties participated in initiating or concluding the transaction and therefore conducted the transaction. Each of these parties knew that the underlying transaction was a contract, combination, or conspiracy, unreasonably in restraint of trade among the several states, or that it otherwise involved an attempt, combination, or conspiracy, to unreasonably monopolize some part of trade or commerce among the several states, including without limitation scrap metal processing, and so they knew that the property involved represented the proceeds of some form of unlawful activity.

The 2012 acquisition of Miller Compressing Company in fact involved the proceeds of specified unlawful activity, at a minimum because it was part of a set of parallel or dependent transactions all of which were part of a single plan or arrangement and some of which involved the proceeds of specified unlawful activity including without limitation unlicensed money transmitting in violation of title 18 U.S.C 1960 as described elsewhere in this complaint.

Having hereby alleged that each specified defendant conducted a financial transaction which they knew involved the proceeds of unlawful activity and which in fact involved the proceeds of specified unlawful activity, it's further alleged generally that each of them knew that the transaction was designed in whole or in part to conceal or disguise the nature, location, source, ownership, or control of the proceeds of specified unlawful activity, including without limitation the proceeds from any such racketeering acts predicated on federal law that share a statutory basis with the acts described in this complaint and which had prior to the transaction or would subsequent to the transaction generate or proceeds in their usual course of business, for example possession of Altered Vin vehicles in violation of title 18 U.S.C 2321.

Furthermore, it's hereby alleged that each specified defendant had an intent to promote the carrying on of specified unlawful activity, including any such racketeering acts predicated on federal law that share a statutory basis with acts described elsewhere in this complaint whether or not committed against the plaintiff.

I reserve any right and / or privilege to assert any alternative basis for satisfying the elements of this and other offenses including without limitation the particular allegations supporting claims of unlawful activity and specified unlawful activity.

It's also alleged that Goldstein Group Inc, Alter Trading Corporation, Miller Compressing Company, Jon Spigel, Robert Goldstein, and Michael Goldstein did aid, abet, induce, procure, and willfully cause the commission of this act in connection with and by way of their direction

18

and participation in the 2012 acquisition of Miller Compressing Company by Alter Trading Corporation.

**"2012 money laundering" Plain and simple**: The applicable defendants conducted a financial transaction, which they at least knew involved the gross receipts of an anticompetitive merger, and it in fact involved the gross receipts of at least unlicensed money transmitting and probably also gross receipts from altered VIN possession.

**Wisconsin statute 180.0129, "2013 Penalty for false documents";**

**Parties concerned in the commission of the crime under Wisconsin statute 939.05 include: Goldstein Group INC, Alter Trading Corporation, Miller Compressing Company, Seven Stars Auto parts LLC, Quarles & Brady, Jon Spigel, Michael Goldstein, and Robert Goldstein;**

Alter Trading Corporation, Miller Compressing Company, Seven Stars Auto Parts LLC, along with, Quarles & Brady LLP, Michael Goldstein, and Jon Spigel caused a document to be delivered to the Department of Financial Institutions for filing, which they knew to be false in a material respect at the time of its delivery.

On or about May 17th 2013, Seven Stars Auto Parts LLC, along with those persons mentioned in the above paragraph, acting through Alter Trading Corporation employee and agent Johnathan Spigel and Quarles when filing for the Wisconsin trademark "Wrench-N-Go" in the name of Seven Stars Auto Parts LLC completed a document which read in relevant part;

"I, being duly sworn, state that: I am the registrant or duly authorized representative of the registrant; the facts set forth in this application are true; the registrant has the right to the use of the subject of the registration applied for, and that no other person or persons, firm, partnership, corporation, association of union of workers has any such right in the identical form or in any such near resemblance thereto as may be calculated to deceive..."

The statement that no other person or corporation had any such right to the use of the subject of the registration applied for in such near resemblance thereto as may be calculated to deceive, was false.

At the time that Seven Stars Auto Parts LLC along with Quarles & Brady applied for registration of the "Wrench-N-Go" mark in Wisconsin for Seven Stars Auto Parts LLC, Alter Trading Corporation owned the active federal registration for the trademark "Wrench-N-Go".

The two marks were in such near resemblance thereto as may be calculated to deceive. Quarles & Brady, being experienced in the practice of law, including trademark law, at the time of the alleged violation, knew that Alter Trading Corporation owned an identical federal mark. The implicated Defendants had knowledge of the identical federal mark, and knew that the mark being applied for was in such near resemblance thereto, as could be used to deceive.

That particular representation contained In the document was material. It was the only part of the document that the registrant or agent for the registrant was required to swear to. Therefore the false statement under oath made the document false in a material respect. So, the document was

20

false in a material respect, while Alter Trading Corporation, Miller Compressing Company, Seven Stars Auto Parts LLC, along with, Quarles & Brady LLP, Michael Goldstein, and Jon Spigel knew that it was false in a material respect, and they each delivered it or caused it to be delivered to the Wisconsin Department of Financial Institutions for filing.

The timing of this trademark registration corresponds to Alter Trading Corporation's acquisition of Miller Compressing in 2013 and was related to the acquisition.

In connection with the 2013 acquisition of Miller Compressing by Alter Trading Corporation, Michael Goldstein in his capacity as an employee of Alter Trading Corporation moved to Milwaukee as the "inter-integration director" for the acquisition.

Michael Goldstein moved to Milwaukee in consultation and conspiracy with Robert Goldstein and the Goldstein Group. Robert Goldstein was involved in Michael's move to Milwaukee in his capacity as Michael's father, as Alter Trading executive leadership, and as a board member for the Goldstein Group Inc. Jon Spigel wouldn't have even thought to register the wrench-n-go trademark in Wisconsin without the involvement of whoever was pulling the strings at parent companies, and whoever was pulling the strings knew about the identical federal mark held by Alter Trading, and as inter integration director Michael was involved, and Robert as his superior and supervisor was involved. The only way that Seven stars submits that false statement to obtain the Wisconsin wrench-n-go mark, is if it was caused by someone at Alter Trading Corporation and/or other parent companies who knew that Alter Trading owned the identical federal mark.

This and other acts are alleged against each of the specified and/or implicated Defendants, together as a whole and each separately, and under any applicable theory of liability for each including aiding and abetting, direct commission, willfully causing, etc.

**"2013 penalty for false documents" Plain and simple:** Various defendants were involved in causing the delivery of a sworn false statement to the Wisconsin department of financial institutions for Seven Stars Auto Parts LLC to obtain a Wisconsin state trademark that was identical to a federal mark owned by Alter Trading Corporation, under culpable circumstances.

**Wisconsin statute 180.0129, "2013 conspiracy to commit penalty for false documents"; Committed by Goldstein Group INC, Alter Trading Corporation, Miller Compressing Company, Seven Stars Auto parts LLC, Quarles & Brady, Jon Spigel, Michael Goldstein, and Robert Goldstein:**

Those acts laid out in the immediately preceding paragraphs form in substantial part the basis for this allegation of conspiracy to commit the relevant offense, with conspiracy plead as an additional predicate

The Goldstein Group INC, Alter Trading Corporation, Miller Compressing Company, Seven Stars Auto parts LLC, Quarles & Brady, Jon Spigel, Michael Goldstein, and Robert Goldstein conspired with each other, to cause a document to be delivered to the Department of Financial Institutions for filing, which they knew to be false in a material respect at the time of its delivery.

## Wisconsin statute 946.32, "2013 false swearing"

**Parties concerned in the commission of the crime under Wisconsin statute 939.05 include: Alter Trading Corporation, Seven Stars Auto parts LLC, Quarles & Brady, Jon Spigel, and Michael Goldstein;**

Seven Stars Auto Parts LLC and Jonathan Spigel, on or about May 17th 2013, under oath or affirmation, subscribed a false statement which they did not believe was true, when such statement was authorized or required by law or required by a governmental agency as a prerequisite for such agency taking some official action.

Seven Stars Auto Parts llc, was acting through their agent Jonathan Spigel when he signed a statement which read; "I, being duly sworn, state that: I am the registrant or duly authorized representative of the registrant; the facts set forth in this application are true; the registrant has the right to the use of the subject of the registration applied for, and that no other person or persons, firm, partnership, corporation, association of union of workers has any such right in the identical form or in any such near resemblance thereto as may be calculated to deceive…"

He signed that statement while applying for a Wisconsin trademark for "Wrench-N-Go". Subscription of that statement was required by the Wisconsin Department of Financial Institutions which is a government agency for granting the Wisconsin mark for "Wrench-N-Go", I don't believe that there was an alternate means for obtaining the mark, but in the event that there was, subscription of that statement was required at least for the granting by such means as were utilized by Seven Stars Auto Parts LLC for obtaining the Wisconsin mark.

23

The statement that no other person or corporation had any such right to the use of the subject of the registration applied for in such near resemblance thereto as may be calculated to deceive, was false. It was false because Alter Trading Corporation had an identical federal mark, and that identical federal mark was near enough in resemblance that the Wisconsin Mark applied for could be intended to deceive.

The word "subscribes" means signing. Jonathan Spigel was under oath or affirmation when he subscribed that statement. Seven Stars Auto Parts LLC and Jonathan Spigel knew that it was false at the time that it was subscribed. Knowledge is also imputable, because they were working closely with Quarles & Brady for obtaining the mark, Quarles & Brady was an experienced law firm that knew about the Alter Trading Corporation mark. so in addition to other averments of knowledge Quarles & Brady knew about the federal mark, and so Seven Stars and Jonathan Spigel also knew.

Additionally, this registration was sought in connection with the acquisition of Miller Compressing by Alter Trading Corporation. Michael Goldstein moved to Milwaukee to act as inter-integration director in connection with the Miller Compressing acquisition in his capacity as an employee of Alter Trading Corporation, and was involved in willfully causing the 2013 false swearing. Michael Goldstein knew that Alter Trading Corporation owned an identical mark, and insofar as his involvement was in his capacity with Alter Trading Corporation, Alter Trading Corporation certainly knew.

24

This act is being alleged against Alter Trading Corporation, Miller Compressing Company, Seven Stars Auto Parts LLC, Quarles & Brady, Jon Spigel,  and Michael Goldstein, at least. Similarly to the above alleged act, together and separately, and under any applicable theory of liability.

**"2013 false swearing" plain and simple**: Prior to causing delivery to the Wisconsin DFI of the signed false statement as described in the penalty for false documents act, the statement was signed under oath and the signing of the statement under oath was its own wrongful act.due to attendant circumstances including guilty mind.

**Wisconsin statute 946.32, "2013 conspiracy to commit false swearing"**

**Parties concerned in the commission of the crime under Wisconsin statute 939.05 include: Alter Trading Corporation, Seven Stars Auto parts LLC, Quarles & Brady, Jon Spigel, and Michael Goldstein;**

Those acts laid out in connection with the previous section form in substantial part the basis for this claim of conspiracy to commit the relevant offense.

Alter Trading Corporation, Miller Compressing Company, Seven Stars Auto Parts LLC, Quarles & Brady, Jonathan Spigel, and Michael Goldstein, conspired so that under oath or affirmation, a false statement which they, Jonathan Spigel and Seven Stars Auto Parts LLC did not believe was true would be subscribed by Jonathan Spigel acting in his capacity as an agent for Seven Stars Auto Parts LLC, Miller Compressing Company, Alter Trading Corporation, and the Goldstein

25

Group INC, when such statement was authorized or required by law or required by a governmental agency as a prerequisite for such agency taking some official action.

## Title 18 U.S.C section 1343, "2013 wire fraud, planning on the phone"

**Principals under title 18 section 2 include: Alter Trading Corporation, Miller Compressing Company, Seven Stars Auto parts LLC, Quarles & Brady, Jon Spigel, Michael Goldstein, and Robert Goldstein;**

Alter Trading Corporation, Miller Compressing Company, Seven Stars Auto Parts LLC, Quarles & Brady, Jonathan Spigel, Robert Goldstein, and Michael Goldstein, used cell phones in interstate commerce when coordinating with each other, in furtherance of a scheme or artifice, to obtain property by means of false statements or false pretenses.

The property included without limitation the Wisconsin "Wrench-N-Go" trademark, or the physical memorandum representing ownership of a Wisconsin registered DBA and/or trademark. The false statements and pretenses included without limitation the same false statements and pretenses described in the above acts. The victims included without limitation the state of Wisconsin, the Wisconsin public at large, and the Wisconsin department of financial institutions

The implicated defendants used cell phones while coordinating their activities for Seven Stars Auto Parts LLC to obtain the Wisconsin "Wrench-N-Go" registration with related physical memorandum by means of false pretenses and for Quarles & Brady to obtain money from Seven

26

Stars or other entities as compensation for their role in the scheme, and in coordinating over the cell phones they caused sounds to be transmitted by means of radio communication, with their cellular service providers being entities not domestic to Wisconsin, and therefore their use of those cellular services and the transmission of the relevant sounds was in interstate commerce. Alternatively as to any given defendant the sounds were transmitted over wire using landlines, with such use being in interstate commerce without limitation because of the involvement of non-domestic entities in leading the underlying transactions.

Quarles & Brady acting by Susan Lapinski, and Alter Trading Corporation along with Miller Compressing Company and Seven Stars Auto Parts LLC each acting without limitation by Jonathan Spigel in coordination with Michael and Robert Goldstein engaged in the conduct constituting this predicate act, in Milwaukee Wisconsin or surrounding suburbs, on or about May 17th 2013. Michael's location at relevant times is less than certain, and Robert's location at relevant times is unknown pending discovery, but the communications themselves took place at least partly in Milwaukee Wisconsin for each.

**"2013 wire fraud, planning on the phone" plain and simple:** The delivery of the signed and sworn to false statements to the Wisconsin department of financial institutions was its own scheme that was agreed upon by various defendants, and at a minimum it involved an intent to obtain physical memorandum of the state trademark from the Wisconsin DFI as an immediate victim of the false representations, and in furtherance of that scheme they probably used cell phones and computers in interstate commerce.

27

## Title 18 U.S.C section 1341, "2013 mail fraud by causing delivery"

**Principals under title 18 section 2 include, Alter Trading Corporation, Miller Compressing Company, Seven Stars Auto parts LLC, Quarles & Brady, Jon Spigel, and Michael Goldstein,;**

Alter Trading Corporation, Miller Compressing Company, Seven Stars Auto Parts LLC, Quarles & Brady, Michael Goldstein and Jonathan Spigel, having devised a scheme or artifice for obtaining property by false pretenses or representation, knowingly caused to be delivered by mail according to the direction thereon a matter or thing. The property that they sought to obtain, was the registered Wisconsin trademark for "Wrench-N-Go" and/or the physical memorandum representing ownership of such a mark.

The false pretenses or representations that they sought to obtain it by, involve that portion of the application for the Wisconsin mark that contains the following text; "I, being duly sworn, state that: I am the registrant or duly authorized representative of the registrant; the facts set forth in this

application are true; the registrant has the right to the use of the subject of the registration applied for, and that no other person or persons, firm, partnership, corporation, association of union of workers has any such right in the identical form or in any such near resemblance thereto as may be calculated to deceive..." The statement that no other person had any such right in the identical form or in any such near resemblance thereto as may be calculated to deceive was false. The statement that the facts set forth in the application were true was false. The false pretenses included a pretense that no other person had any such right in the identical form or in any such

28

near resemblance thereto as may be calculated to deceive, and that the facts set forth in the application were true.

The matter or thing that they caused to be delivered by mail included, written information sent by the Wisconsin Department of Financial Institutions, to registrants for Wisconsin trademarks when they acquired the marks. In 2013, when a person acquired a state trademark with the Wisconsin Department of Financial Institutions, the Wisconsin Department of Financial Institutions would mail them information. When they registered the Wisconsin mark, they caused that mail to be delivered.

Quarles & Brady, being an experienced law firm, providing legal services since 1892, had knowledge of state practices concerning the issuance of trademarks, including those involving the mailing of information to Wisconsin trademark registrants. They knew that mail containing written information for registrants would be delivered when Seven Stars Auto Parts LLC registered the Wisconsin mark for "Wrench-N-Go" and they caused the delivery of that mail.

Quarles & Brady was an agent of Alter Trading Corporation, Miller Compressing Company, Seven Stars Auto Parts LLC, and knowledge of the agent was imputable to the principal, which for this act included the aforesaid defendants.

Quarles & Brady acting by Susan Lapinski and Alter Trading Corporation, Miller Compressing Company, Seven Stars Auto Parts, and Michael Goldstein, acting by Jonathan Spigel engaged in

29

the conduct constituting this predicate act in Milwaukee Wisconsin or surrounding suburbs, on or about May 17th 2013

**"2013 mail fraud by causing delivery" plan and simple:** The physical memorandum that constituted property for the purposes of the wire fraud allegations would have been and was delivered to applicable persons by mail. When applicable defendants made the false representations they caused the delivery by mail of property which furthered the scheme to obtain property by false representations

## Title 18 U.S.C 1952 "2013 use of interstate facilities to facilitate possession of stolen vehicles and vehicle parts"

**Principals under title 18 section 2 include,**

Alter Trading Corporation with other defendants in connection with the previously described conduct, used facilities in interstate commerce including cell phone towers, with intent to facilitate future conducting of financial transactions, including transfers involving use of a Seven Stars Auto Parts LLC as a business that sells vehicles, where such future transactions would involve property including without limitation the official Wisconsin bill of sale instruments that are used by defending enterprises to facilitate specified unlawful activity including possession of altered vin vehicles and vehicle parts, and with intent to facilitate the carrying on of unlawful activity including possession of altered vin vehicles and vehicle parts.

Seven Stars Auto Parts LLC was to be a business that sold vehicles, and Alter Trading Corporation with other defendants intended to facilitate future transactions through that business.

30

As a reseller such transactions would involve Wisconsin Bills of sale, which Alter Trading Corporation and subsidiaries use as part of a scheme to obtain and retain possession of stolen motor vehicles with altered or obliterated vins. Despite themselves violating state theft laws and other applicable state and federal laws when receiving and processing stolen motor vehicles, as described further in, Alter Trading Corporation uses its processing of the bills of sale to assert immunity defenses to facilitate continued and future possession of stolen vehicles where applicable conduct was neither in good faith or reasonably believed to have been performed in accordance with applicable sections of law governing potential grants of immunity.

Notwithstanding the potential applicability of any immunity, the bills of sale along with other property were nonetheless used to facilitate continued and future possession of stolen altered vin vehicles. Irrespective of if they were immune from money damages in any given civil cases, or immune with respect to some conduct but not other conduct, they still violated the criminal law. Even if they were immune to civil actions, which they weren't and aren't and any claims of immunity by any defendant are fully contested by the prosecution, they still used the property to facilitate possession of stolen cars.

So Alter Trading Corporation used facilities in interstate commerce with intent to use Seven Stars Auto Parts LLC to possess and deal in stolen motor vehicles with obliterated or altered vins, and for Seven Stars to use property to facilitate its dealing in stolen motor vehicles.

**"2013 use of interstate facilities to facilitate possession of stolen vehicles and vehicle parts"**
**plain and simple:** Goldstein Group INC and Alter Trading Corporation use subsidiaries to

facilitate racketeering activity, including without limitation violations of title 18 U.S.C 1956.
Defendants used facilities of interstate commerce with an intent to facilitate unlawful activity
and thereafter did facilitate the carrying on of unlawful activity.

Without limitation, they use subsidiaries as opposed to divisions so as to facilitate the disguising
of the nature and control of proceeds of specified unlawful activity in connection with violations
of title 18 U.S.C. 1956, and to facilitate retention of altered vin vehicles in connection with
violations of title 18 U.S.C 2321 whereby claims of good faith that are fully contested by the
prosecution are nonetheless used by defendants in furtherance of retaining altered VIN stolen
vehicles and in the commission of their own thefts, where such claims are more defensible when
made through subsidiaries than they would be for a division due to Alter Trading Corporation's
extensive history of receiving stolen vehicles directly.

### Title 18 U.S.C. section 2321 "2014 Anoka Minnesota 143 stolen cars"

**Principals under title 18 section 2 include,**

In 2014 Alter Trading Corporation doing business as Alter Metal Recycling, in Anoka
Minnesota, participated in a crime spree where they took and/or drove up to 143 stolen motor
vehicles under circumstances where they had reason to know that the vehicles were stolen and
that the owners and authorized agents of the owners of such vehicles did not give consent, and
therefore their taking and/or driving of the vehicles was in violation of Minnesota statute 609.52
subdivision 2 (17).

32

The violations of Minnesota state theft law constitute non-compliance with applicable state law with respect to the Anoka stolen vehicles, making alterations or obliterations of the VIN's of such vehicles and their parts a violation of title 18 USC 511. Alter Trading Corporation crushed either all of these stolen cars and their parts or some of these stolen cars and their parts, and in doing so altered or obliterated the VIN's contained on those vehicles and parts. and since their obliterations of the Anoka stolen vehicle and vehicle part VIN's were in violation of 511, the conduct was within the scope of title 18 U.S.C 2321 whereby they possessed with intent to sell or otherwise dispose of motor vehicles and/or motor vehicle parts including without limitation the metal frames of said motor vehicles knowing that the identification numbers for such motor vehicles had been obliterated, tampered with, or altered. When they crushed the stolen vehicles they obliterated, tampered with, or altered the identification numbers contained on those vehicles including without limitation such VIN's as were located on the frames of such motor vehicles where said frames constitute a distinct motor vehicle part, and they thereafter possessed those motor vehicles and parts with intent to sell them and/or to otherwise dispose of them.

A guy was stealing cars by towing them and taking them to Alter Trading Corporation doing business as Alter Metal Recycling to sell to them, between January and May of 2014 he had delivered to Alter at least 143 vehicles, at least 50 of those within those four months were confirmed stolen and he had delivered at least 143 stolen vehicles in total. This particular person had a practice where when filling out the paperwork for the vehicles when delivering them to Alter he would increase or decrease the last or first digit of the vin by a single number. This practice had been entirely discoverable, and is highly suspicious, so Alter had reason to know that he was dealing in stolen vehicles and that the owners or their agents didn't consent, they had

33

reason to know because the real vins were on the stolen vehicles and the falsified vins were clearly wrong on the paperwork, and that's cause for alarm. Even after having discovered his practice of incrementing the VIN's by a single digit. Alter Metal Recycling continued to receive stolen vehicles from him.

**Additional or alternative pleading of 2024 Title 18 U.S.C section 2321 violations, "2014 Anoka Minnesota 143 stolen cars"**

**Alter Trading Corporation 2014 Violations of 2321 involving 143 Anoka cars**

**Principals under title 18 section 2 include,**

In 2014 Alter Trading Corporation through its location in Anoka Minnesota engaged in an extensive crime spree involving numerous violations of title 18 2321 and title 18 2312, receiving one hundred and forty three stolen motor vehicle or more, under circumstances where they had reason to know that those vehicles were stolen and by extension that the owner or an authorized agent of the owner did not consent to their taking of the vehicles, and so the vehicles were received in violation of Minnesota statute 609.52 subdivision (2) paragraph (a) subparagraph (17) and so they had not complied with applicable state law with respect to the vehicles. With Alter Trading Corporation operating as a scrap metal dealer enterprise, many of those cars were undoubtedly crushed, whereby the vehicle identification numbers inscribed or affixed throughout those vehicles and on various parts certainly would have been obliterated, tampered with, or altered by the crushing.

34

With the modification of the vins of such vehicles occurring within the scope of title 18 511, that puts the handling of such vehicles within the reach of title 18 2321. Alter Trading Corporation possessed with intent to sell or otherwise dispose of such motor vehicles and motor vehicle parts knowing that the identification numbers for those vehicles and parts had been obliterated, tampered with, or altered by the crushing.

Alter Trading Corporation through its location in Anoka Minnesota doing business as Alter Metal Recycling, received and processed at least 143 stolen motor vehicles in connection with this 2014 crime spree, and for each of those vehicles they probably crushed, melted, or otherwise deformed at least a single motor vehicle part containing a vin as required under the statute, thereby altering the vins, and with their conduct otherwise satisfying the requirements of the pleaded violations. The person who was stealing the motor vehicles and selling them to Alter at least as their usual practice was changing one digit of the vins to be one number greater or lesser than the actual vin, which Alter could have confirmed if checking the vins themselves, at some point they found out definitively about this practice and continued to receive the stolen motor vehicles.

I'm also alleging violations of this statute as having been willfully caused by Alter Trading Corporation. Whoever they transferred the altered vin vehicles or vehicle parts to, and they more likely than not transferred at least some of those vehicle parts or some of those vehicles, they willfully caused such persons to possess such altered vin vehicles or parts, where such conduct would have been a violation of title 18 2321 if Alter had committed the possession directly, therefore making Alter Trading Corporation a principal under U.S.C title 18 section 2. So this

pleading is potentially 143 acts from direct possession, and another 143 acts from willfully causing the possession by others while Alter themselves had the requisite mens rea, and the willfully causing acts may even be more than one per vehicle.

**Both pleadings of title 18 U.S.C section 2321 "2014 Anoka Minnesota 143 stolen cars" plain and simple:** Alter Trading Corporation received up to or upwards of 143 stolen cars, and crushed them, they crushed either some of the cars and parts or all of the cars and parts, which altered the VIN's, and they possessed those altered vin cars and parts with intent to sell, under circumstances where the statute reaches their conduct.

**Alter Trading Corporation 2014 violations of 2312 "2014 transportation of stolen vehicles" Principals under title 18 section 2 include,**

With respect to the 143 plus stolen motor vehicles received by Alter Trading Corporation in connection with the 2014 Anoka crime spree described in part in the above two pleadings, Alter Trading Corporation knew that at least some of them were stolen, and certainly such knowledge was more likely than not after they had discovered the falsification of VIN practices of the seller. They nonetheless transported those stolen motor vehicles before and after having discovered the falsification of vin practices of the person who they were obtaining them from. This transportation was in interstate commerce without limitation because transportation in interstate commerce commences when the journey begins, and they were received in Minnesota while Alter Trading Corporation was a Missouri Corporation, and they surely transported some of those motor vehicles as scrap across state lines, and such journeys commenced while they were intact motor vehicles. Each of the things in this paragraph are hereby alleged and I'm alleging

36

generally knowledge that each vehicle was stolen, I am certain they knew at least some were stolen, but for the avoidance of any confusion I'm alleging they knew that each was stolen.

I'm also alleging this as both direct commission and additionally as willful causing. I think they willfully caused the crushed stolen motor vehicles to be transported all over the country by all sorts of different people, under circumstances where if they had done it themselves it would have been a violation of title 18 U.S.C section 2312, and therefore they were a principal violating title 18 section 2312. At a minimum they shipped at least some of the vehicles out of state or sent them to someone else to ship out of state.

Also for the avoidance of any confusion, I'm alleging each act under any statute relating to the Anoka stolen vehicles with respect to any and every number of cars between 1 and 143.

**"2014 transportation of stolen vehicles" plain and simple:** Alter Trading Corporation transported some of the stolen vehicles they received and processed in 2014 in interstate commerce, with knowledge that the vehicles were stolen. Their knowledge is averred generally and was inferable from the circumstances.

## Title 18 U.S.C 1956 "2019 Money laundering"

In 2019, Alter Trading Corporation, Miller Compressing Company, and Seven Stars Auto Parts LLC, engaged in a transaction whereby assets were transferred between defendant business entities, which generally will be referred to as the 2019 reorganization. That transaction was a financial transaction. Each of these parties participated in initiating or concluding the transaction

37

and therefore conducted the transaction. Each of these parties knew that Seven Stars Auto Parts LLC's registration with the Wisconsin DFI for the Wisconsin Mark Wrench-N-Go and related assets, were the proceeds of unlawful activity, at a minimum by way of constituting gross receipts of the felonious state law violations alleged in this complaint in connection with the obtaining of that mark.

The 2019 reorganization in fact involved the proceeds of specified unlawful activity, at a minimum because Miller Compressing Company, and Seven Stars Auto Parts LLC themselves, along with associated lands and facilities, were the gross receipts of specified unlawful activity committed in connection with the 2012 acquisition by Goldstein Group Inc and Alter Trading Corporation of Miller Compressing Company. Additionally the assets of Miller Compressing Company and Seven Stars Auto Parts LLC also included proceeds of wire and mail frauds described in this complaint including without limitation the Wisconsin state registration for a Wrench-N-Go mark, and also the proceeds of racketeering activity not described in this complaint including possession of altered vin vehicles involving other stolen cars and car parts.

Having hereby alleged that each specified defendant conducted a financial transaction which they knew involved the proceeds of unlawful activity and which in fact involved the proceeds of specified unlawful activity, it's further alleged generally that each of them knew that the transaction was designed in whole or in part to conceal or disguise the nature, location, source, ownership, or control of the proceeds of specified unlawful activity, including without limitation the proceeds from any such racketeering acts predicated on federal law that share a statutory basis with the acts described in this complaint and which had prior to the transaction or would

38

subsequent to the transaction generate proceeds in their course of business, for example possession of Altered Vin vehicles in violation of title 18 U.S.C 2321.

I reserve any right and / or privilege to assert any alternative basis for satisfying the elements of this and other offenses including without limitation the particular allegations supporting claims of unlawful activity and specified unlawful activity.

Furthermore, it's hereby alleged that each specified defendant had an intent to promote the carrying on of specified unlawful activity, including any such racketeering acts predicated on federal law described in the preceding paragraph.

**"2019 Money laundering" plain and simple:** Similar to the acquisition of Miller in 2012, there was a restructuring in 2019 involving Alter Trading Corporation, Miller Compressing Company, and Seven Stars Auto Parts LLC, which involved similar criminal intentions and incriminating attendant circumstances, as well as additional proceeds of specified unlawful activity. In furtherance of designs to use subsidiaries to facilitate racketeering, including without limitation facilitating possession of stolen property and altered VIN vehicles, and proceeds of their mail and wire frauds, and proceeds from causing unlicensed money transmitting, and to disguise the control of such proceeds, etc, Goldstein Group INC, Alter Trading Corporation, Miller Compressing Company, Seven Stars Auto Parts LLC, among others, conducted a restructuring so as to create another degree of separation between criminal enterprise supervising persons with their shareholders and applicable subsidiaries as instruments of crime.

39

Defendants even used the occurrence of this restructuring to influence police investigations into stolen property which defendants had received shortly after the restructuring. Shortly after the restructuring Seven Stars Auto Parts LLC had received stolen property and were telling the police that it was all new people despite long term common ownership and leadership and a lot of the same people. They almost immediately were using it to influence police investigations in their favor and to effectively disguise or conceal the nature, source, or control of criminal proceeds.

## Title 18 U.S.C section 1343 "2012 and 2019 theft victim wire frauds, intent to devise"

All of the defendants involved in the 2012 and 2019 acquisition and reorganization had an intent to retain stolen property when it came into the possession of defendant businesses thereby obtaining it for themselves and others, and with particular emphasis Seven Stars Auto Parts LLC, Miller Compressing Company, Alter Trading Corporation, Goldstein Group INC, and Goldstein Group INC shareholders and conspirators, had such an intent.

The 2019 reorganization was in part to put distance between Alter Trading Corporation and Seven Stars Auto Parts LLC for obtaining stolen property. The very purpose of the restructuring was to facilitate obtaining stolen property from the rightful owners, by means of false representations transmitted to the department of Justice or their intermediary, and they had similar designs during the 2012 acquisition.

Who, what, when, where, how? Without limitation;

40

- The defendants specified in the 2012 and 2019 money laundering acts are "who".

- They had designs to obtain stolen property from victims for themselves and others whenever stolen property would be delivered to their businesses, that's the "what" that they were seeking to obtain, stolen property whenever it was delivered to them.

- The relevant wire transmissions took place at times surrounding the 2012 acquisition and 2019 reorganization, and the false representations and wrongful obtaining of property were to occur whensoever stolen property was received by defending businesses or other Goldstein Group INC subsidiaries or subsidiaries of subsidiaries, including at the time of the acts that injured William Armstrong, that's the "when" for the wire transmissions and the false representations and the obtaining.

- The "where" is in Milwaukee Wisconsin and any locations where individual actors were situated while conducting and coordinating the money laundering transactions. The "where" also includes the locations of applicable defendant business when false representations were to be made, such as the address of Seven Stars Auto Parts LLC or other businesses intended by defendants to operate similarly.

- The "how" includes criminal slander of title by Alter Trading Corporation subsidiaries,.or like misrepresentations regardless of a given state's legal framework. The "how" also includes false pretenses of good faith and statutory immunity. The Goldstein Group INC family of businesses including each named defendant operates in bad faith, with intent to ratify thefts for their own benefit, while committing their own thefts along with numerous other state and federal crimes, at the expense of victims. False representations communicated by wire to the Department of Justice or state operators of the national motor vehicle title information system are part of their scheme to obtain stolen property

41

from victims and for themselves or others, so too are false representations and pretenses communicated to theft victims relating to the options of those victims for recovering their property or the value of their property from the <u>Alter family of businesses.</u>.

Applicable defendants intended to obtain stolen property for themselves and others from victims, by means including false representations and pretenses. They had schemes and artifices to obtain property, and also intended to devise schemes and artifices as the need arose, in particular cases for obtaining particular properties. William Armstrong was directly injured by the execution of their intent to devise schemes and artifices to obtain property by means of false pretenses as need for defending businesses arose when receiving stolen property, including by the transmission over wire of the criminally slandered title and other communications in furtherance of their scheme.

**Title 18 section 1952 "2020 use of interstate facilities to facilitate 1956 money laundering"**
In 2020 GGI Motors was created as a Goldstein Group INC subsidiary for the purposes of acquiring American Industrial Motor Services. Alter Trading Corporation at the time had a long-standing business relationship with American Industrial Motor Services. Bob Ellis who served as a multi-agent for a number of Goldstein Group INC and Alter companies is quoted as saying "Alter Trading has worked with AIMS for many years in connection with our auto shredding business, and this acquisition is a very natural fit for us,". Although the acquisition was structured to be through GGI Motors as a wholly owned subsidiary of Goldstein Group INC, it was functionally an acquisition in furtherance of Alter Trading Corporation and Alter Trading Corporation subsidiaries business, which is why at moments it was talked about by Ellis at the

time in a way indistinguishable from if it in fact on paper had been an Alter Trading Corporation acquisition.

One of the reasons the sale was structured as it was, is because of Alter Trading Corporation's extensive pattern of racketeering activity. They had an intent to facilitate destruction of stolen vehicles and possession of altered VIN vehicles, and the laundering of related criminally derived assets with requisite intent under title 18 section 1956, among other things.

Alter Trading Corporation had recently in 2014 engaged in the massive crime spree in Anoka Minnesota, and the sale was structured to limit their exposure to RICO liability, but it was structured that way with an intent to facilitate their continued racketeering. It's a subsidiary of Goldstein Group INC instead of Alter Trading Corporation, because they didn't want to use Alter Trading Corporation's direct subsidiaries to facilitate their racketeering, because of increased exposure to enterprise participation liability if their direct subsidiaries are used to facilitate racketeering. It also limits Alter Trading Corporation's direct exposure to title 18 section 1952 liability, and aiding and abetting liability when their motors are used to shred stolen vehicles.

I guarantee you that one of the reasons that the sale was structured the way that it was, was because of Alter Trading Corporation's extensive pattern of racketeering activity, and knowledge that the relevant group of businesses would further offend. Goldstein Group INC is just further removed from Alter Trading Corporation itself and their subsidiaries which are more likely to directly injure victims.

43

So Goldstein Group INC, used facilities in interstate commerce when organizing and executing the AIMS acquisition with intent to facilitate the carrying on of title 18 section 1956 money laundering by Alter Trading Corporation and other subsidiaries in the chain of companies such as Seven Stars Auto Parts LL and Goldstein family members C, and they thereafter did facilitate the carrying on of title 18 section 1956 money laundering or attempted to.

Alternatively and additionally, the entire arrangement was intended to distribute the proceeds of unlawful activity including title 18 section 1956 money laundering proceeds obtained by Alter Trading Corporation to other members of the Goldstein family. They created GGI Motors to facilitate distribution of Alter Trading Corporation's and their subsidiaries ill gotten gains to Goldstein Group INC and other members of the Goldstein family. The intended distribution would be effectuated by both or either moving money around in connection with the acquisition itself or as a customer. Distributing the proceeds of unlawful activity as a customer is almost like a classic money laundering picture, where ostensibly you're paying to do laundry, but really, you're moving dirty money to your person. It doesn't have to all be dirty, it's enough that some of it is dirty.

They made Marc Goldstein president of GGI Motors and AIMS, and Marc is one of Robert Goldstein's sons, like Michael Goldstein. Part of the purpose of that transaction was to set up Marc as the president of a company or companies. On its own that's fine, except the Goldstein family in their conduct of scrap business deals in dirty money with intent to deal in dirty money.

44

Although this act is primarily alleged against Goldstein Group INC, it's also alleged without limitation against Alter Trading Corporation, Robert Goldstein, Michael Goldstein, and Bob Ellis, who are believed and hereby alleged to have been involved in the underlying transactions.

At a minimum, defendants thereafter facilitated or attempted to facilitate the distribution of proceeds of unlawful activity, and the carrying on of unlawful activity, when they facilitated the appointment of Marc Goldstein as president of GGI Motors. If the idea is to distribute proceeds of money laundering to their family member as a customer, setting them up as the president of that company facilitates that.

**Wisconsin statute 943.20 "2021 Wisconsin state thefts"**

**Parties concerned in the commission of the crimes under Wisconsin statute 939.05 include: Chanel, All Seasons Trucking 2 LLC, Alter Trading Corporation, Miller Compressing Company, and Seven Stars Auto Parts LLC**

The value of my motor vehicle was greater than three thousand dollars when obtained by Seven Stars and when scrap metal was removed, and it would have cost me over three thousand dollars to replace my motor vehicle. Seven Stars Auto and/or Alter Trading Corporation paid no more than three hundred and eighty four dollars ($384) to All Seasons Trucking 2 LLC as consideration when obtaining my stolen motor vehicle. Therefore the value of the property was greater than $2,500 dollars for each theft alleged in this complaint even after a deduction for consideration paid, and the thefts were of a felony nature constituting predicate acts for Wisconsin state RICO.

The thefts are being pleaded in the alternative as both aggregated counts pursuant to a single intent and design, and as discrete acts.

**First as discrete acts:**

My motor vehicle constituted property that was damaged during the removal of metal parts from my motor vehicle. The motor vehicle contained installed copper and/or aluminum conductors, wires, or cables, including for example in its wiring harnesses. The scrap metal which was removed when the vehicle was shredded included such copper and/or aluminum components. With respect to such scrap metal derived from the applicable components, the crushing of the vehicle was one step constituting part of the removal process, Alter Trading Corporation and its subsidiaries scrap motor vehicles in bulk and the crushing and shredding is necessary for removal of the metals to be efficient. Therefore the value of the property includes the cost that would be incurred in repairing or replacing my motor vehicle as property that was damaged in the theft or removal of applicable aluminum or copper parts as scrap metal.

**Chanel theft by taking**

I had met a woman who said her name was Chanel, we had gone for a drink, and afterwards I stopped at a gas station, and I went into the gas station while she remained in the vehicle, I had left the car running with the radio on and climate control functioning, and while I was in the gas station she drove off with my vehicle. She did not have my permission to take my motor vehicle. She took my motor vehicle without my consent and with intent to deprive me as the owners

46

permanently of possession of the vehicle. At the time of the taking the vehicle was worth more than three thousand dollars and there was no consideration paid for her obtaining the vehicle.

**Chanel theft by use**

When Chanel drove off in my car without permission she used the vehicle, while still having the requisite intent described above, and while the vehicle was worth more than $3,000. Alternatively after she had parked, and when she was exiting the vehicle, she used the door, thereby using the vehicle in a manner distinct from taking. Alternatively, she drove my vehicle more than once while in possession of it, and the second or further time that she drove it, it was theft by use since she had already taken it the first time, and then after taken it she was using it, with the requisite intent and with the value still over three thousand dollars.

**Chanel theft by retention**

During the period of time between the initial theft by taking and the thefts by use, Chanel retained possession of my stolen motor vehicle, with the requisite intent, and with the value over three thousand dollars, thereby committing theft by retention.

**Chanel theft by transfer**

At some point Chanel transferred my vehicle to All Seasons Trucking 2 LLC, with the owners consent and with intent to deprive me as the owner permanently of possession of the vehicle..

47

and with the value of the vehicle being greater than $3,000, thereby committing Wisconsin state theft by transfer.

## All Seasons Trucking 2 LLC theft by use

When receiving and after having received the plaintiffs stolen motor vehicle from Chanel, All Seasons Trucking 2 LLC used plaintiffs stolen motor vehicle during the transportation and/or inspection of his motor vehicle, including without limitation by using the doors and levers when inspecting the vehicle, and using the wheels of plaintiffs vehicle to roll the vehicle, either behind a towing vehicle or onto the bed or other similar feature of a towing vehicle. By using plaintiffs motor vehicles parts, while installed on plaintiffs motor vehicle, thereby causing that vehicle to operate, in furtherance of the theft of plaintiffs motor vehicle, without my consent as the owner and while the vehicle was worth more than $3,000, All Seasons Trucking 2 LLC committed theft by use. They knew my car was stolen, and nonetheless received it from Chanel, and disposed of it at Seven Stars Auto Parts LLC, using it in the process.

## All Seasons Trucking 2 LLC theft by transfer

After having received my stolen motor vehicle from Chanel All Seasons Trucking 2 thereafter transferred my stolen motor vehicle to Seven Stars Auto Parts LLC, without my consent as the owner, and while the vehicle was worth more than $3,000, thereby committing theft by transfer.

## Seven Stars theft by use

When Seven Stars first obtained my vehicle, and committed theft by use at a minimum by using doors and levers to operate and manipulate the vehicle for disassembly and inspection, it would

48

have cost me at least three thousand dollars to replace my car. Seven Stars knew that my vehicle was stolen, and received and processed it with an intent to permanently deprive me of the property, and knew that it did not have the owners consent to do so. They probably opened a door or the engine compartment which would have involved using mechanical devices that were part of the vehicle, or they probably used the vehicle's tires or fixed components such as a towing hitch or comparable features when moving it, even if they didn't roll it to transport it they had to use a part of the stolen vehicle to secure it to a transport device.

### Seven Stars theft by transfer *

At a minimum when Seven Stars shipped the processed vehicle including scrap metal derived from copper or aluminum wires etc, they thereby transferred that scrap metal or the transfer took place at an earlier or later time. The theft by transfer therefore involved scrap metal, and my vehicle though at the time a shell of its former self was probably scuffed, or dented, or further compressed while being shipped. It probably wasn't at the top of the shipping vessel, it was probably in the middle or toward the bottom, and so probably got further bent at least at some discrete point under the weight of other scrap during shipping.

### Seven Stars theft by concealment

During previous litigation in the Milwaukee circuit court, no later than 5-14-2024 plaintiff requested discovery of such shipping records as were required to be kept for at least two years under 29 CFR 516.6. Seven Stars had been informed of my intention to pursue legal action in connection with my stolen motor vehicle at least on a conversion claim well before the filing of my initial lawsuit in the small claims court of Wisconsin on November 6th 2023 in which they

were served on November 7th 2023. They had received my vehicle on November 15th 2021, and so had at least a week from being served in that lawsuit to the end of the mandatory retention period to implement their litigation hold, but they had more time than that because they had been informed of my intention well in advance and had conferred with attorneys in connection with that notice.

Seven Stars Auto refused to provide the shipping records that were requested in discovery that they and their attorneys had an independent duty to implement a litigation hold on and to provide. By destroying those records with notice of forthcoming litigation, or by concealing those records by failing to provide them despite their continued existence while stating that they didn't have any such records, or by otherwise failing to retain regardless of destruction, they effectively concealed my property. They had a duty to implement a litigation hold, and maybe they destroyed the records, maybe they still had them and just didn't provide them, i don't know yet, but i wanted and requested the shipping records to find out more about what happened to my property, and by refusing to provide them or failing to retain despite a duty to do so of which their attorneys would have been well aware of and capable of performing, they concealed my property. At the time of the theft by concealment it would have still cost me more than three thousand dollars to replace my motor vehicle which was damaged in the removal of the scrap metal that was concealed.

They concealed my stolen motor vehicle without limitation by not fully complying with my discovery request, and not limited to records under the aforementioned record retention law. I requested "any and all communications, materials, or documents, which concern to any degree,

50

stolen motor vehicles or stolen motor vehicle parts coming into the possession of or being processed in any way whatsoever by Wrench 'N Go, Alter trading corporation, or any subsidiaries of Alter trading corporation, or any brother or sister companies of Alter trading corporation." which of course is inclusive of my own stolen motor vehicle. I don't believe that they provided me with all pertinent materials in their possession that would assist me with tracking down and understanding what happened to my stolen vehicle. I consider this to have been an act of concealment operating to prevent me from locating my stolen motor vehicle and stolen motor vehicle parts in whatever form they happened to take at the time.

## Seven Stars theft by retention

At least in the alternative, Seven Stars received my stolen motor vehicle on November 15th 2021 and retained it from the dates of November 15th 2021 to November 16th 2021, with the requisite criminal intent. The retention continued while the vehicle was being crushed, and so the motor vehicle as property was damaged in the theft by retention of the scrap metal that was contained in the motor vehicle.

This act is being alleged without stipulating for all purposes as to the relevant times of possession or the persons who possessed or otherwise controlled the stolen motor vehicle at relevant times. I reserve the right to allege that Alter Trading Corporation or other parties possessed or otherwise controlled the stolen motor vehicles concurrently with any other possession, acts, or control alleged against any other parties.

## Intent to plead additional thefts

51

I intend to plead additional Wisconsin theft statute violations by at least Alter Trading Corporation, Quarles & Brady, Robert G. Ellis, and Miller Compressing, in addition to conspiracy counts in connection with the alleged state thefts.

**All "2021 Wisconsin state thefts" plain and simple:** The various defendants intentionally took, used, transferred, concealed, and retained my stolen property, without my permission and with intent to permanently deprive me of it. The value of my vehicle or the cost to me to replace it was at all times pertinent to the allegations a sufficient sum as to constitute felony thefts, even adjusted for consideration paid by Seven Stars Auto Parts LLC to All Seasons Trucking 2 LLC when obtaining my vehicle.

## Title 18 U.S.C section 2312, "2021 transportation of stolen vehicles"

**Principals under title 18 section 2 include,**

Defendant Alter Trading Corporation and defendant Seven Stars Auto transported in interstate commerce a motor vehicle knowing the same to have been stolen. Transport in interstate commerce commences when the journey begins. Alter Trading Corporation and Seven Stars Auto transported plaintiffs motor vehicle within their facility while handling and processing the vehicle. The transport in interstate commerce for that motor vehicle commenced, while it was being transported by each defendant while handling and processing the vehicle, with intent to ship it or its parts across state lines.

My basis for claiming that the motor vehicle was transported in interstate commerce includes

that transportation in interstate commerce commences when transportation begins even if

ultimately the motor vehicle is only transported within one state. My basis also includes that

because the defendants Seven Stars Auto and Alter Trading Corporation were engaging in

interstate commerce while handling and processing the vehicle, and so the transport of that motor

vehicle was part of their activities of interstate commerce, the transportation itself was in

interstate commerce. So, I'm alleging transport in interstate commerce occurred even if an intent

to ship the motor vehicle across state lines was absent, because the motor vehicle was transported

as part of an activity which itself constituted interstate commerce, although I am also alleging

that they had an intent to ship the vehicle across state lines.

Seven Stars Auto and Alter trading corporation knew that the motor vehicle was stolen at the

time of their transport of the motor vehicle in interstate commerce. Seven Stars Auto and Alter

Trading Corporation had both bona fide and constructive knowledge that the motor vehicle was

stolen. Also knowledge of the agents was imputable to the principals.

It's also alleged that Chanel and All Seasons Trucking 2 LLC did aid, abet, induce, procure, and

willfully cause the commission of this act by transferring and conspiring to transfer my stolen

motor vehicle to Seven Stars Auto Parts LLC with the intent that this ultimately crime be

committed.

**"2021 transportation of stolen vehicles" plain and simple:** The applicable defendants knew

my car was stolen and transported it in interstate commerce. The transport was in interstate

commerce without limitation because some of it would ultimately be shipped out of state, or they were delivering it to Alter Trading Corporation as a foreign corporation, or it was a joint venture or concerted activity involving both domestic and foreign business entities, or some alternative.

**Title 18 U.S.C section 659, "2021 interstate or foreign shipments"**

**Principals under title 18 section 2 include,**

Seven Stars Auto parts LLC and/or Alter Trading Corporation stole or unlawfully took or carried away, from a vehicle, with intent to convert to their personal use, goods or chattels which were moving as, were part of, or which constituted an interstate shipment of property.

Seven Stars Auto Parts LLC and/or Alter Trading Corporation removed or carried away goods and chattels from plaintiffs Motor vehicle while processing the vehicle. Including but not by way of limitation, the inner metal frame of the vehicle, the outer shell of the vehicle, the mechanical components of the vehicle, the upholstery, after market floor mats, and other parts or materials which were installed or contained in the plaintiff's motor vehicle.

At the time when Seven Stars Auto Parts LLC and/or Alter Trading corporation removed the goods and chattels from the vehicle, those goods and chattels constituted part of an interstate shipment, or were moving as part of an interstate shipment. Much like the transport of the motor vehicle in interstate commerce commenced when the journey began, so too, did the goods and chattels moving as part of an interstate shipment commence when the journey began. At a

54

minimum, the metal in the vehicle constituted or was being moved as part of an interstate shipment while the motor vehicle was being processed into scrap metal.

Further, Mazdas aren't made in Wisconsin, the goods and chattels which made up plaintiffs motor vehicle, constituted an interstate or foreign shipment, by virtue of retaining that status. The only way any of us came into possession of the relevant goods and chattels, is on account of those goods and chattels being received as interstate or foreign shipments. So, the vehicle and the articles which it was composed of retained their status of constituting a foreign or interstate shipment. My Mazda was built in Japan, and at all times pertinent to this complaint was plaintiffs foreign shipment.

Seven Stars Auto and Alter Trading Corporation also committed this predicate act by receiving or having such goods and articles in their possession knowing the same to have been stolen. Knowing that the goods and chattels which previously constituted plaintiffs' motor vehicle had been stolen, and that those goods and chattels had been unlawfully taken from a vehicle that was moving as part of or that constituted an interstate or foreign shipment of property, Seven Stars Auto and Alter trading corporation retained possession of such goods and chattels. Seven Stars Auto and Alter Trading Corporation also knew that among those goods and chattels were goods and chattels that were removed from a vehicle.

Alter Trading Corporation also violated title 18 section 659 by willfully causing acts to be done, which if directly performed by themselves or another would be this offense against the United States. That is, knowing the property to be stolen, and knowing that the property was taken from

55

a motor vehicle, and constituted an interstate shipment, they caused other people to buy or receive the goods and chattels, but if they bought or received the property themselves it would be this offense against the United States, on account of Seven Stars Auto Parts LLC and Alter Trading Corporation having knowledge that the customer themselves might not have knowledge of. In connection with their customers possession they're principals by willfully causing acts to be done which if they do it themselves would constitute this offense.

It's also alleged that Chanel and All Seasons Trucking 2 LLC did aid, abet, induce, procure, and willfully cause the commission of this act by transferring and conspiring to transfer my stolen motor vehicle to Seven Stars Auto Parts LLC with the intent that this ultimately crime be committed.

**"2021 interstate or foreign shipments" plain and simple:** applicable defendants knew my car was stolen and took stuff out of my vehicle, including without limitation its structural guts which constituted chattels. At the time the vehicle itself was being moved as an interstate shipment as between defendants because their processing of the vehicle was de facto the processing and packaging of an interstate shipment, or the car itself having been a foreign import retained its character as a foreign shipment at relevant times.

Also, even if they didn't have knowledge in the first place when removing goods from my vehicle, after i informed them that my car had been stolen and that they common law converted it, retaining possession or thereafter causing of possession of any such goods was then guilty, so long as the other factual predicates were satisfied by goods or chattels having been removed

from an interstate shipment unlawfully and with intent to convert to the takers use. Even if they didn't have knowledge at first, once they had knowledge it was illegal to possess or cause possession of my stolen goods, that were removed from my vehicle while it was being moved as an interstate shipment.

## Title 18 U.S.C. 2321, "2021 possessing altered VIN stolen vehicle"

**Principals under title 18 section 2 include,**

Seven Stars Auto parts LLC and Alter Trading Corporation, knowingly Altered or obliterated an identification number for plaintiffs motor vehicle or motor vehicle parts. Seven Stars Auto parts LLC and Alter Trading Corporation knew that plaintiffs motor vehicle was stolen and so each would not be a person referred to in subsection (b) (2) of USC title 18 511, but even if they didn't know that it was stolen, they did not comply with applicable state law with respect to plaintiff's stolen motor vehicle, including without limitation on account of their related violation of Wisconsin State criminal slander of title law, and other state laws, such as ferrous scrap purchasing laws, common law conversion, et al. Therefore the alteration or obliteration of vins contained on plaintiffs motor vehicle was in violation of title 18 section 511.

They either knew or should have known that some portion of the contents of the Wisconsin Bill of Sale, which is an instrument relating to title to personal property, and which was used in connection with the defendants acquisition of my vehicle, were false, a sham, or frivolous, when they submitted it for filing or recording with the Wisconsin department of transportation. Among

other reasons, because they should have known that the statements on the Wisconsin Bill of Sale were false, they failed to comply with applicable state law with respect to my motor vehicle.

Alter Trading Corporation and Seven Stars Auto Parts LLC possessed my stolen motor vehicle with a vin that was obliterated or altered in a manner that violated title 18 section 511 and was not caused by collision or fire, knowing that its identification numbers had been obliterated or altered, with intent to sell or otherwise dispose of my stolen motor vehicle and my motor vehicle parts that had obliterated or altered vins,

Additionally with intent to further their own theft of my motor vehicle, they obliterated, tampered with, or removed decals or devices affixed to my motor vehicle pursuant to the Motor Vehicle Theft Prevention Act, including without limitation the front window decal or device which also contained the motor vehicles identification number. The vin was located on such decals or devices in addition to being located elsewhere on the vehicle imprinted or engraved or otherwise placed on parts which had not been affixed pursuant to the theft prevention act.

For clarity, Some decals or devices were affixed pursuant to the theft prevention act, and other parts weren't affixed pursuant to the theft prevention act. The vin for my motor vehicle was located both on parts which were so affixed, and also on parts which were not so affixed, but in any case at least in the alternative, the identification number itself was inscribed or affixed for purposes of identification under part C of subtitle VI of title 49, including without limitation voluntary placement for identification under 49 U.S. Code § 33110. Even if vin placing persons didn't have to put the vin on the vehicle they did put the vin on the vehicle so it could be

58

identified under that law and others, and otherwise identified for any lawful purpose, both on parts affixed pursuant to the theft prevention act and 0arts not affixed pursuant to that act.

Notice a difference between removing, obliterating, tampering with, or altering a decal or device, and doing any of those things to an identification number itself located elsewhere on a vehicle. Also with respect to removal of any such decals or devices, they weren't the owner of my motor vehicle and they weren't authorized by me as the owner to do anything with devices or decals, they weren't authorized by state law, and they weren't authorized by regulations promulgated by the Attorney General to implement the Motor Vehicle Theft Prevention Act.

So they obliterated or altered the vin of my stolen motor vehicle, and thereafter possessed my stolen vehicle and parts with altered vins knowing that the vins were altered and with intent to sell or dispose of the vehicle and parts, where the obliteration or alteration of the vins was in violation of title 18 511, which thereby violated title 18 section 2321.

It's also alleged that Chanel and All Seasons Trucking 2 LLC did aid, abet, induce, procure, and willfully cause the commission of this act by transferring and conspiring to transfer my stolen motor vehicle to Seven Stars Auto Parts LLC with the intent that this ultimately crime be committed.

**2021 possessing altered VIN stolen vehicle" plain and simple:** They crushed my stolen car, and in doing so altered the VIN on my stolen car and car parts. The relevant defendants aren't excluded from the reach of the statutes at a minimum because they hadn't complied with state

59

law with respect to my vehicle, including without limitation because they criminally slandered title when submitting the bill of sale to the Wisconsin department of transportation. Possessing my destroyed stolen vehicle with its corresponding obliterated VIN was a violation of law.

**Wisconsin statute 943.60, "2021 criminal slander of title"**

**Parties concerned in the commission of the crime under Wisconsin statute 939.05 include:**

Seven Stars Auto Parts LLC and Alter Trading Corporation, submitted for filing, entering, or recording, instruments relating to title to personal property, and knew or should have known that some part of the contents of the instruments were false, a sham, or frivolous. I'm alleging violations of this law under subsections (1) and (2).

Seven Stars Auto Parts LLC and Alter Trading Corporation, submitted for filing, entering, or recording a junked vehicle bill of sale, to the Wisconsin Department of Transportation. The junked vehicle bill of sale is an official document provided by the Wisconsin Department of Transportation, and so was an instrument, that instrument related to title to personal property, where the personal property was plaintiff's motor vehicle, and some part of the contents of the instrument were false, a sham, or frivolous, including that portion of its contents which falsely indicated that the certificate of title had been marked junked and surrendered to the Department of Transportation.

60

In addition to claims that the respondents directly committed the crime, I'm also alleging that Alter Trading Corporation is liable under Wisconsin statute 939.05 (2) (c), for having advised, hired, counseled or otherwise procured it's commission, as well as additionally liability on a basis of it being a crime committed in pursuance of another intended crime, which under the circumstances is a natural and probable consequence of the other intended crime, where the other crime includes at least theft by use, transfer, concealment or retention of movable property without the other's consent and with intent to deprive the owner permanently of possession of such property..

Alter Trading Corporation had an intent to ratify thefts for their own benefit, and to retain stolen property. It's not their core business, but its a part of it. When stolen property was brought in they didn't want to turn it away and acted so as not to turn it away, and when learning about it, they wanted to and acted so as to retain the stolen property and transfer it. In their business, the natural and probable consequence of them having acted with intent to transfer and retain stolen property, was criminal slander of title. Without criminal slander of title they're not crushing stolen cars, the criminal slander of title happened because they operated with an intent to commit theft of cars themselves. Seven Stars Auto Parts LLC and Alter Trading Corporation commit theft by transfer and retention and concealment of stolen cars.

It's also alleged that Chanel and All Seasons Trucking 2 LLC did aid, abet, induce, procure, and willfully cause the commission of this act by transferring and conspiring to transfer my stolen motor vehicle to Seven Stars Auto Parts LLC with the intent that this ultimately crime be committed.

61

**"2021 criminal slander of title" plain and simple:** At a minimum they should have known that the Wisconsin Bill of sale that they submitted to the Wisconsin department of transportation contained false representations relating to title to my motor vehicle. They probably knew that it was stolen and had bona fide knowledge of false representations on the bill of sale, but at a minimum they should have known. Because they submitted for filing, recording, or entering, the Wisconsin Bill of Sale which was an instrument that related to my vehicle's title, and they at least should have known that some part of its contents were false, they criminally slandered the title to my car.


**Wisconsin statute 943.30, "2021 threats to injure"**

**Parties concerned in the commission of the crime under Wisconsin statute 939.05 include:**
Following the conversion of plaintiffs' stolen motor vehicle, on or about July 12th 2022, Plaintiff learned that the vehicle had been received by Alter Trading Corporation and contacted the Milwaukee location which was shared by Seven Stars Auto, at which time Plaintiff spoke with Brian Downer who is an employee of the defendants.


At the time of the telephone conversations between plaintiff and Brian Downer, Google search results returned both the same address and telephone number for both Wrench 'N Go and Alter Trading Corporation. Brian Downer had apparent authority to speak in a representative capacity for Alter Trading Corporation.

At that time, Brian Downer in his representative capacity for Seven Stars Auto and Alter Trading Corporation was maintaining the position that plaintiff would have to seek recovery against the tow truck company and not against the Alter businesses. Employee Brian Downer told plaintiff that it wasn't his "first rodeo" thereby communicating to the plaintiff that he had prior experience dealing with consumer complaints regarding businesses receiving stolen property, inferrably in his capacity as an employee for Defendants.

Plaintiff understood that common law conversion is a strict liability tort, and that the defendant would be properly joined in a claim for conversion of the stolen property, and explained that it would be appropriate for defendants to file a cross claim against their vendor. Agent for the defendants Brian Downer mentioned that there were attorneys employed by the parent company, at which time the plaintiff encouraged Brian Downer to confer with those attorneys so as to be informed of the relevant laws.

A later telephone interaction between the defendant and the plaintiff involved Brian Downer expressing the intention of the Defendants to prosecute a counterclaim against the plaintiff if they were named as Defendants for the conversion, and indicating that the aforementioned intention was the result of what the attorneys for the parent company had told him, and there a result of an agreement between the subsidiary, the parent corporation, and at least two employees of the respective businesses, with such agreement being herein alleged to be conspiratorial.. Defendants had no legitimate claims against plaintiff at the time, and would not have reasonably expected legitimate claims against plaintiff to accrue.

63

When the defendant threatened the plaintiff with a counterclaim, doing so was a threat to injure plaintiff's property or business with intent to extort a pecuniary benefit, or to compel plaintiff to omit from doing a lawful act. It was a true threat. It was a communication of a serious intent to cause significant harm to the plaintiff. They tried to bully me into just letting them keep my stolen property for free.

Doing so was in violation of Wisconsin statute 943.30, which is an act indictable under state law involving extortion, and punishable by over a year in prison and so included as a racketeering act for federal RICO.

Even if their counterclaim would be malicious or frivolous, even a frivolous prosecution could prospectively succeed, and inure to the benefit of them and to the injury of my property and business. With no legitimate claims against plaintiff, they threatened to pursue plaintiff's property with an abusive prosecution. The threat to plaintiff's business involved at least that my sole proprietorship would be forced to defend itself against a giant corporation or giant business enterprise set on further injuring me, and further profiting from their tortious and criminal conduct, thereby indirectly deriving additional income from their pattern of racketeering activity. I understood that to name them as a defendant I would be forced to defend myself from a giant corporation bent on further injuring me. The threat to maliciously or abusively prosecute me, was a threat to my business and property.

The pecuniary benefit that they attempted to extort includes that they attempted to extort me into giving them the vehicle. Prosecuting claims against only the tow truck company, would be

tantamount to the plaintiff giving the property to Alter Trading Corporation. They threatened me as part of an attempt to cause me to give them my stolen property. The pecuniary benefit that they sought to extort also includes, that they sought to maintain their profit margins on that property which were inflated on account of the property being stolen. The property was stolen, and was sold to defendants for less than what it was worth, which inflated their profit margins, and they sought to retain those benefits, and they sought to obtain that benefit by extorting the plaintiff so as to obtain the property.

The lawful acts which they sought to compel plaintiff to omit from doing includes joining them in a lawsuit in connection with the prosecution of plaintiffs claims related to the stolen motor vehicle. They wanted to keep their ill gotten gains, and so sought to compel me to omit from seeking recovery against them for the value of my property, or the return of my property.

**"2021 threats to injure" plain and simple:** They tried to scare me into just letting them keep my stolen car for free, by threatening to maliciously prosecute me.

**Title 18 U.S.C section 1951, "2021 interference with commerce by threat"**
**Principals under title 18 section 2 include, Alter Trading Corporation, Miller Compressing Company, Seven Stars Auto Parts LLC, Quarles & Brady,**
Those acts laid out as part of the above act of racketeering activity, also constituted an attempt or conspiracy to affect commerce or the movement of articles or commodities in commerce by extortion, or such as the completed act.

65

As used in the Hobbs act the term "extortion" means "the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right." Within the context of the Hobbs act, the word "obtain" encompasses "bring[ing] about a transfer or purported transfer of a legal interest in the property, whether to the obtainer or another.' "

Threatening and prosecuting the counterclaim, and conspiring to threaten or prosecute the counterclaim, was an attempt or conspiracy to obtain the plaintiff's property with his consent induced by use of fear, so as to affect commerce involving plaintiff's stolen property, and so as to affect the movement of those articles or commodities which constituted plaintiff's stolen property, or rather than an attempt or conspiracy the aforementioned was achieved as the completed act.

Defendants sought to retain and/or elevate their possession and control over plaintiff's stolen property, and sought to induce plaintiff's consent by use of fear. Defendants sought to obtain plaintiffs property, by either Inducing plaintiff to abandon the property while it was under the control of the defendant, or by inducing plaintiff to relinquish legal interest in the property directly to the defendant without the step of abandonment or discarding,

Threatening and prosecuting the malicious or abusive counterclaim, or conspiring to threaten or prosecute such counterclaim, was an attempt or conspiracy to obtain legal interest in the plaintiff's property, or a completed act constituting a like violation of title 18 section 1951.

66

When you obtain the intangible interest in the tangible property you thereby obtain the tangible property. Ownership of physical property is effected by obtaining the intangible "title". Notice the difference between obtaining an intangible property, and obtaining the tangible property by virtue of obtaining legal interest in the tangible property. If the word "obtain" reaches the obtaining of legal interest in the property, then the defendant was able to obtain the property for themselves despite the fact that the property was already in the custody of the defendant. So, they attempted to or or conspired to or did obtain the property for themselves by attempting to, conspiring to, or in fact obtaining legal interest in the property, by means of consent induced by fear.

Also, threatening and prosecuting the malicious or abusive counterclaim, or conspiring to threaten or prosecute such counterclaim, was an attempt or conspiracy to obtain legal interest in plaintiff's property for someone other than the defendant. Defendant attempted to cause the plaintiff to acquiesce in defendant's retention of the vehicle. By attempting to cause plaintiff to name as a defendant only defendant's vendor, defendant intended to induce plaintiff to entrust to defendant the property which constituted plaintiff's stolen motor vehicle by use of fear, and if plaintiff were to entrust plaintiff's stolen property to the defendant, then defendant alleged in the alternative would have thus obtained legal interest in that property for subsequent purchasers, by virtue of being able to pass on better title than they had on account of the entrustment. So, they attempted to or conspired to or did, obtain the property for their customers by obtaining legal interest in the property for their customers, by means of consent induced by fear, and by virtue of, acquiring the right to transfer better title then they themselves had, by procuring an entrustment through the extortionate threat.

67

The way a conversion claim works is, upon a successful recovery for conversion the property becomes the property of the defendant and the property is considered paid for. Alleged in the alternative, If plaintiff were to prosecute a conversion claim only against Alter Trading Corporation and Seven Stars vendor vendor, then prior to the conclusion of that conversion claim, plaintiff would have been entrusting plaintiff's stolen property to the defendant, by acquiescing in defendant's retention of the property. At the time plaintiff had not acquiesced in defendant's retention of plaintiffs stolen property.

Under the uniform commercial code, there's an exception to the general rule that one can not pass on a better title to goods than one themselves has. The uniform commercial code reads "Any entrusting of possession of goods to a merchant who deals in goods of that kind gives him power to transfer all rights of the entruster to a buyer in ordinary course of business" There are exceptions for stolen property which are relevant for determining the capacity of the car thief to transfer title and the status of defendants title, but specific to our facts, entrusting possession of plaintiffs property by plaintiff to the defendant, pleaded in the alternative, would allow defendant to confer better title than defendant themselves had, and therefore would have constituted defendant obtaining the property for their customer.

The result that defendant intended to effectuate, involved without limitation affecting defendants profit margin when disposing of plaintiffs stolen property, which constitutes affecting commerce. Defendants sought to affect the movement of the articles and commodities in commerce, by empowering themselves to freely dispose of that property in commerce despite its status as stolen

68

property, and to evade any obligation they might have to produce the stolen chattel, therefore affecting the movement of those goods between defendants and their customer, and between the defendants and the plaintiff.

**"2021 interference with commerce by threat" plain and simple:** They tried to intimidate me into just letting them have my stolen car for free by threatening me with malicious prosecution by their giant business enterprise.

**Title 18 U.S.C section 1343 "2021 Armstrong property wire fraud"**

In addition to allegations that specific acquisitions and reorganizations were conducted with a continual intent to devise schemes and artifices for obtaining property by false representations and pretenses when receiving stolen property in the course of their businesses, I'm also alleging an additional act relating to the specific conduct involving my stolen property. When they received my stolen property they did scramble to devise false representations and pretenses for obtaining property.

Seven Stars Auto Parts LLC intended to obtain William Armstrong's motor vehicle by means of false representations and pretenses communicated to the department of Justice or an intermediary through their transmission of the bill of sale containing false representations and their commission of criminal slander of title.

When Seven Stars Auto Parts LLC committed criminal slander of title, that was in itself the transmission of false representations and pretenses by wire, and they were sending those writings

69

in furtherance of a scheme to obtain from William Armstrong his stolen property without having to compensate him. So, they sent wire communications in interstate commerce with intent to obtain William Armstrong's motor vehicle for themselves or others, by means of false representations, including those on the bill of sale. That was part of their scheme to keep my stolen property. Also, false representations described in the coercion acts relating to my options as a crime victim for seeking recovery of my property were also false representations and false pretenses.

Additionally Alter Trading Corporation, Miller Compressing Company, Quarles & Brady, Rob Ellis, each played a direct role in sending communications over wire and mail scheming to keep my stolen car and income derived from their disposition of my stolen car.

**<u>Wisconsin Statute Chapter 961 "2021 Uniform controlled substances act"</u>**
**Parties concerned in the commission of the crime under Wisconsin statute 939.05 include: Alter Trading Corporation, Miller Compressing Company, Seven Stars Auto Parts LLC, Alter Logistics & Transloading company, Michael Goldstein;**

It's hereby alleged that Alter Trading Corporation, Miller Compressing Corporation, Seven Stars Auto, and Alter Logistics, engaged in conduct constituting violations of the Wisconsin uniform controlled substances act, involving dealing in controlled substances, (as defined in section 102 of the Controlled Substances Act), which were chargeable under state law and punishable by imprisonment for more than one year.

In prior litigation Seven Stars Auto LLC provided a copy of a weight ticket for my motor vehicle from when they received it, which gave a weight of 2,800 Pounds. The curb weight for my vehicle was between 2811 and 2828 pounds. Curb weight is the weight of the vehicle with full fluids. A gallon of gas weighs about six pounds, my vehicle's fuel tank had a capacity of approximately 14.5 gallons. My gas tank was probably closer to empty than full when received by the Defendants. My car probably had less than 9.5 gallons of gas when they received it, which means they probably falsified the weight ticket to increase the weight of the vehicle.

The above said facts are hereby alleged. For the avoidance of any doubt, I'm alleging that they falsified an increased weight on the weight ticket as part of a pattern of drug dealing.

Seven Stars Auto has a history of charges involving inflated weight tickets, there was a previous Wisconsin forfeiture action, involving falsified weight tickets where they had allegedly increased the weights, in that instance my recollection is that they blamed ice or something, which is certainly a plausible explanation but in the context of my vehicle almost certainly having it's weight falsified with the weight ticket representing a greater weight than actual, it's also circumstantial evidence of a continuing pattern, and i think that they were falsifying weight tickets to sell drugs.

I have good evidence that they increased the weight for my vehicle, and why else would you falsify a greater weight when you're buying scrap metal unless you're smuggling something, and if they're smuggling something it's probably drugs, and it's probably weed or cocaine. I have at least a circumstantial case that they were violating the Wisconsin uniform controlled substances

71

act which I'm hereby alleging, including without limitation violations of Wisconsin statute 946.41 (1) (a) (b) and (c), by dealing and/or delivering applicable controlled substances.

Based on my evidence that they falsified the weight ticket and inference that it was part of a pattern of drug dealing I also infer that they used Alter Logistics in furtherance of their pattern of drug dealing and that Alter Logistics participated in the pattern. Why else would you falsify the weight tickets unless you're shipping? You could just sell drugs without doing anything with weight tickets. The weight tickets are probably falsified to cover their tracks at weigh stations with shipping manifests and other shipping records. My understanding is that freight trucks over ten thousand pounds are generally required to be weighed at weigh stations, and that's one reason why a person would falsify increases to weight tickets so that a truck or other shipping vehicle seems to be carrying more weight from legitimate goods then it's actually carrying. Regular weighing of commercial vehicles and other details are also applicable to shipping by train and other means.

Alter Logistics has a facility apparently owned and operated by Alter Trading Corporation in Milwaukee listed on its website as part of its network. I'm inferring and alleging that if Seven Stars Auto is falsifying weight tickets for drug dealing the drugs are probably ending up at that facility for shipping one way or another along with scrap metal used to conceal the drug shipments, some of the drugs are probably coming in from Canada, and moved around the country using the Alter Logistics facilities.

72

I don't believe it would be that sophisticated and only one location, I infer and allege that Alter Logistics is aware and involved as a participant and that their other facilities are also used for drug dealing. If they're shipping enough drugs that they're falsifying weight tickets i infer they're using the other Alter Logistics facilities, and because they're a closely held family owned business enterprise I infer they're all involved to some degree, including leadership in each applicable company.

**"2021 Uniform controlled substances act" plain and simple:** They appear to have falsified an increased weight of my motor vehicle, and from that I infer that they sell drugs. The most likely reason for them to falsify an increased weight on the weight ticket is because they're involved in smuggling something, and if they're smuggling something it's probably drugs, in violation of controlled substances acts. If they're smuggling drugs to a significant enough extent that they're falsifying paperwork then they're probably also using the Alter Logistics facility

**<u>Wisconsin statute 946.32 (1) (a) and (b),"2024 false swearing"</u>**

**Parties concerned in the commission of the crime under Wisconsin statute 939.05 include: Alter Trading Corporation, Miller Compressing Company, Seven Stars Auto Parts LLC, Quarles & Brady, Robert G. Ellis,**

Seven Stars Auto Parts LLC and/or Alter Trading Corporation, procured Robert G Ellis to present sworn testimony by means of affidavit in proceedings between William Louis Armstrong and Wrench 'N Go, in the matter then titled "William Louis Armstrong vs Wrench 'N Go".

73

Robert G Ellis, in providing sworn on oath testimony by means of affidavit, made a false statement which he did not believe was true, when such oath or statement was authorized or required by law.

The false statement includes that Seven Stars Auto Parts LLC had a registered DBA of "Wrench 'N Go" with the state of Wisconsin as of 6-20-2024, and that the document attached as Exhibit D in the "Affidavit of Robert Ellis re Wrench 'N Go" was proof of that registration.

Robert G Ellis, knew that the registration was not for "Wrench 'N Go" but was instead for "Wrench-N-Go". That is, one has dashes instead of an apostrophe and the apostrophe is omitted in the dash version.

Robert G Ellis, also knew that the aforementioned exhibit was not proof of such registration by Seven Stars Auto Parts LLC, as of 6-20-2024, because what was attached as Exhibit D, shows only a registration that had expired in May 2023. He didn't miss the expiration date, he knew that certificate of registration wasn't good, he was general counsel of a major corporation with decades of experience including in intellectual property law, and he also knew that the dashes were part of the trademark.

As of Wednesday July 10th 2024, the State of Wisconsin Department of Financial Institutions trademark search tool showed that the trademark mentioned in the Robert G Ellis affidavit

expired on 5-28-2023, and remained expired up to at least the day of the search. This confirmed they had not renewed the trademark for making the claim in the affidavit.

Seven Stars Auto Parts LLC, Alter Trading Corporation, and Quarles procured Robert G Ellis to make that sworn false statement.

**Wisconsin statute 943.39 (3), "2024 fraudulent writings"**

**Parties concerned in the commission of the crime under Wisconsin statute 939.05 include: Alter Trading Corporation, Miller Compressing Company, Seven Stars Auto Parts LLC, Quarles & Brady, Robert G. Ellis,**

Those same acts which provide a basis for a claim of false statements, also provide a basis for this allegation of fraudulent writings against Alter Trading Corporation, Seven Stars Auto Parts LLC, Miller Compressing, Robert G. Ellis, and Quarles, . Robert G Ellis made false written statements with knowledge that they were false and with intent that they would appear to be signed under oath, and did so with an intent to injure or defraud.

The context is, during ongoing litigation, Alter Trading Corporation, or a partnership including as members of that partnership both Alter Trading Corporation and Seven Stars Auto Parts LLC in their respective capacities as legal persons, had been the person or people who had appeared as the respondent, but they wanted the status of the case to be that they had been appearing solely as Seven Stars, instead of as Alter or a partnership including Alter, so they made false statements

hoping to have the subsidiary essentially substituted in under false pretenses. They lied about Seven Stars having a registered DBA for the court to mistake their identity.

### Title 18 U.S.C section 1341, "2024 mail fraud"

**Principals under title 18 section 2 include, Alter Trading Corporation, Miller Compressing Company, Seven Stars Auto Parts LLC, Quarles & Brady, Robert G. Ellis,**

The same acts which form the basis for claims of false statements and fraudulent writings provide part of the basis for the allegation of mail fraud and wire fraud.

Seven stars Auto Parts LLC and Alter Trading Corporation, caused the Robert G Ellis affidavit to be delivered by mail, and to be transmitted over the wire or radio, and they did so in furtherance of a scheme to obtain property by means of false pretenses or false statements.

The false pretense could be that Alter Trading Corporation or a partnership including Alter Trading Corporation and Seven Stars, had been appearing exclusively as Seven Stars Auto Parts LLC, and under a false statement theory the false statement could be the false registered DBA statement.

I believe it was a scheme to obtain what is essentially novation of a contract or novation of an interest in a lawsuit. So in order to novate a contract or an interest in a lawsuit between Alter Trading Corporation and their law firm, from Alter Trading Corporation to their subsidiary Seven Stars, they caused to be delivered by mail, and transmitted by wire or radio, false statements, or writings meant to cause action under false pretenses.

For me the question is, what were they lying for? What is so important, that would motivate their lie? Why was false swearing and fraudulent writings worth it for them? That false swearing and fraudulent writing passed through at least two layers of lawyers. What is so important that at least two layers of lawyers put through the false or fraudulent writing?

If nothing else, I suppose it would be safer for a business to prosecute a law firm through a subsidiary, because if you prosecute the law firm you might end up being liable for the law firms costs. That's what I believe motivated them, and what I'm accusing both Seven stars Auto Parts Llc and Alter Trading Corporation of is that they were novating a client agreement or an interest in a malpractice lawsuit to the subsidiary, because it limits risk to the enterprise if they prosecute it through a subsidiary. and it also might assist in creating opportunities for double counting damages between the businesses and the shareholders, and it also might have been to bypass a pre-existing limitation of liability between Alter and the lawyers.

### Title 18 U.S.C section 1343, "2024 wire fraud"

**Principals under title 18 section 2 include, Alter Trading Corporation, Miller Compressing Company, Seven Stars Auto Parts LLC, Quarles & Brady, Robert G. Ellis,**

The same acts which form the basis for a claim of mail fraud, provide a basis for the claim of wire fraud, and the above section relating to mail fraud includes averments pertinent to the claim of wire fraud, including those averments relating to the transmission of writings over the wire or radio. Seven Stars Auto Parts LLC and Alter Trading Corporation, having devised or intending to devise, a scheme or artifice, for obtaining money property by false pretenses, transmitted or

77

caused to be transmitted, writings or sounds by means of wire or radio communication in interstate commerce.

**About the injury - Tax shelter and transportation technology deals**

The pattern of racketeering activity alleged in this complaint, and the alleged use or investment of racketeering proceeds in violation of racketeering laws, and the acquisition and of control over enterprises including without limitation William Armstrong's Enterprise, and the conspiracy between the Defendants to violate racketeering laws, caused injury to William Armstrong's business and property.

Violations of the racketeering laws by defendants, caused the temporary suspension, substantial discontinuation, and permanent cessation, of a number of William Armstrong's business activities engaged in for the production of income. The defendant's pattern of racketeering activity including without limitation crushing his stolen car and possessing the stolen altered vin vehicle, and criminally slandering title to William Armstrong's motor vehicle, caused substantial and persistent disruption to William Armstrong's business.

William Armstrong for a substantial period of time had been largely occupied with trying to remedy the damage caused to him by the defendants, and disabled from engaging in other activities for the production of income to the extent necessary for realizing other income.

Defendant's pattern of racketeering activity proximately caused William Armstrong to suspend other business including without limitation prosecution of other claims against other parties also

78

coinciding, overlapping, and constituting distinct tax shelter business. The suspension of William Armstrong's other business activities for continuing against Alter Trading Corporation, as was appropriate for him to do, was necessary partly on account of the disparity in the size of the plaintiffs and defendants businesses, along with the communicated intent of applicable defendants to cause William Armstrong significant financial injury if he named them as a defendant, despite them arguably being a necessary party.

Defendant's pattern of racketeering activity caused the plaintiff to be busy with seeking remedy for injuries they caused both in and out of court instead of engaging in other activities for the production of income, and the lost productivity as to other things, has resulted in substantial injury to William Armstrong's businesses. The nature of some of the injuries to some extent can be compared to if the defendants had snatched William Armstrong's hat in the dead of Winter and were playing keep away, and William Armstrong had to try and get his hat back so ears wouldn't freeze, and the comparison could include a shoveling business that he can't engage in or can't engage in effectively without his tools, without getting his hat back or a replacement. The defendants actions forced William Armstrong to reckon with injuries they caused including without limitation the losses they caused, causing additional injuries to William Armstrong's business, which can be compared to if they had knocked him on to the ground and his hands got scraped while lifting himself up, or perhaps something broke while standing up, but William Armstrong wouldn't have been knocked down in the first place if they hadn't done what they did.

Initial predicate acts, wrongful uses and investments of income, wrongful acquisitions and maintaining of control, and conspiracy, caused injuries, and they left William Armstrong with no

choice but to reckon with those injuries, and reckoning with those injuries resulted in further injuries still flowing from the initial acts. Maybe a good example would be if they had stabbed William Armstrong and searching for gauze involves increases to his heart rate, which causes a greater loss of blood, in having to reckon with injuries there's additional blood loss to extremities.

The injury to William Armstrong's business includes lost investment income from income that would have been or would be generated sooner but for the defendants racketeering activity and conspiracy, and/or lost investment income derived from income that otherwise would have been but won't be realized in whole or in part because of defendant's racketeering activity and conspiracy, with such losses proximately caused by defendant's pattern.

The closing of other deals was pushed back by at least one and a half years and some deals may have been forever prevented because of the delay, therefore at the time of filing this complaint there's at least one and a half years of investment income which plaintiff will not receive because of the injury to plaintiff's business that was caused by defendant's pattern of racketeering activity.

It's likely that William Armstrong will be able to close on another deal, with a benefit to William Armstrong including at least two billion dollars in investment generating income for William Armstrong, in the form of a contribution to the capital of a business owned by William Armstrong. It's likely those investments would have or will generate an average return for William Armstrong at a compound annual growth rate of 12-25% per year.

The two billion dollars of investable capital for generating investment income for William Armstrong, which would be derived from the other deal, would be invested in the Nasdaq 100 index. The average two year return of the Nasdaq 100 index, over the 15 years from 2009 to 2023, was in excess of 19%.

The Nasdaq 100 index itself has returned an average of over 19% a year, but alternatively with an investment portfolio actively managed by experienced professionals, the investment would generate at least six percentage points more per year of investment income, based on both general market inference and alternatively William Armstrong's historical personal stock picks.

William Armstrong is seeking at least one and a half years of lost investment income, including that investment income which would be generated with the proceeds of other deals, including tax loss transaction deals and the sales involving energy and transportation technology.

William Armstrong seeks to recover the one and a half years of investment income that William Armstrong would generate from the proceeds of tax loss transaction deals and sales involving energy and transportation technology, but for the delay in closing on other dealsncaused by the defendant's pattern of racketeering activity. William Armstrong will have at least one and a half years worth less of investment income, with the proceeds of those other deals, because of the disruption to William Armstrong's business trackable to the racketeering defendant's pattern of racketeering activity.

For the avoidance of any confusion, William Armstrong in connection with a tax shelter business, and also an energy and transportation technology business, claims lost investment income on the basis future revenues from those ventures which were delayed. The closing of completely lawful tax shelter deals, and energy and transportation technology deals were pushed back by at least one and a half years, so William Armstrong seeks recovery for st least one a half years worth of lost investment income on these specific future revenues at a sum based on the historic performance of the NASDAQ 100 index.

The lost investment income on future revenues of a completely lawful tax shelter business, is believed by the prosecution and is hereby claimed to be as much as 19% CAGR on twenty yearly contribution to capital installments of $9,041,792,000, involving income generating retained capital of 25% of that which is $2,260,448,000, which at 19% per year would return $429,485,120, or $257,862,866 per year after corporate taxation at a long term capital gains rate of 21% and personal taxation to William Armstrong as qualified dividends with net investment income tax at a combined rate of 24%. That final amount times one and a half years gives $386,794,299 per installment delayed, multiplied by five as Wisconsin and federal RICO damages gives $1,933,971,495 per installment. Twenty installments gives net profits at $38,679,429,900, discounted at 4.5% which is little bit above the long term safe rate to account for growth on my recovery gives 25,156,978,306 over a twenty year discounting period, 20,187,243,568 over a twenty five year discounting period, and 16,199,274,727 over a thirty year discounting period, each one being claimed as the applicable discount period in the alternate, and the twenty five billion dollar number on this issue is the applicable number for default judgement in money damages.

82

For the energy technology business, it's alleged that lost productivity relating to that venture caused by the defendant's pattern of racial lost William Armstrong not only investment income on future profits, but also direct ordinary income, in that competing technologies are at least one and a half years more advanced, and so the market value of the technology is reduced by the increased value of competing technologies. There's less money William Armstrong will be able to earn using the technology or selling the technology because competing technologies will be more advanced when it enters the market. William Armstrong isn't picky about who he sells it to but he'd like to sell a percentage interest in the energy technology to his royal highness King Mswati the third of Eswatini, because he can issue Eswatinian currency to buy it, and the prosecution thinks that even though it may be bought with Eswatinian currency William Armstrong's damages should be recoverable in United States dollars. William Armstrong hopes to close a deal involving the energy technology prior to trial. At this time the damages to William Armstrong's energy technology business are claimed to be thirteen billion and thirty five million US dollars, which for present purposes can be attributed to one and a half years of lost net investment income at 8.69% per year on energy-technology profits of one hundred billion US dollars.

At this time William Armstrong is seeking recovery of that $13,035,000,000 US dollars at a multiple of five times pursuant to federal and Wisconsin RICO treble and double damages which is $65,175,000,000, with that amount discounted over twenty years at 4.5% per year, for a final amount of $27,024,348,379 U.S dollars, which is the applicable number for default judgement with respect to energy technology money damages. The prosecution does not believe or claim

that it would take twenty years to generate the one hundred billion dollars in energy technology profits, but that number is offered as a convenience with the claim that such a time horizon represents a greater amount of time than it would actually require to obtain those profits. William Armstrong will show if necessary, a novel, gravity ambient electric motor generator, and claims in the alternate that even a 10% ownership would or will sell for twenty installments of ten billion U.S. dollars to a domestic or foreign government, which also in the alternative may be paid in an equivalent amount of foreign currency.

### Financial services company lost profits and damaged business value et al

Additionally, William Armstrong asserts claims for damages involving lost and/or diminished business value, business destruction, and lost profits. The pattern of racketeering activity alleged in this complaint proximately caused the destruction and/or diminished value of plaintiffs businesses along with the conduct of other bad actors as additional proximate cause. These damages include such as distinct from those relating to tax loss transaction business, and energy and transportation technology business.

At the time of William Armstrong's injury William Armstrong had been doing outreach to the public with intent to run for mayor during the special election of 2022 and to develop and grow a public benefit financial services company. Civil rights violations by the police and the city proximately caused lost and/or diminished business value and/or lost profits for William Armstrong in connection with the financial services public benefit company venture, but at the same time the pattern of racketeering activity engaged in by these racketeering defendants also proximately caused these damages and others. In the alternative, the interruption to William

84

Armstrong's business enterprise stemming from the defendant's pattern of racketeering activity, prevented or limited William Armstrong's ability to mitigate damages from the civil rights violations by making it hard to get around during ordinary business hours and in other ways, and therefore functioned as a proximate cause in that way.

The damages to the William Louis Armstrong from the violations of law described in this complaint include lost profits under the modified new business rule and otherwise, as well as lost business value and diminished business value in the alternate each under the modified new business rule and otherwise, and also, emotional distress damages, pain and suffering, diminished earning capacity, injury to business intangibles, et al.

William Armstrong had been working to build a public benefit company with the goal of helping prostitutes establish lawful passive incomes. William Armstrong had two primary business plans for helping them, the first involved organizing prostitutes to co-author recipe books, because the whole book might be too much for anyone, but if you meet many of them and get them to contribute one or two recipes each, then you have something that could earn them lawful residuals. Two, and the main business plan, was for them to have passive income from the operations of a financial services company. William Armstrong's business was operating with an intent to give them a lawful opportunity to solicit investments on behalf of a financial services company and to write them into the cost structure for the business, we would be able to give them something else to sell, without significant economic barriers to entry for getting them involved such as the cost of retail space or shipping.

85

At first William Armstrong thought that the business might commercially use Robinhood but then he checked their terms of service and saw that they didn't allow commercial use, and so prior to William Armstrong's injury he had pivoted to a business plan involving development of his own app, because the business needed an app that allowed commercial use. His initial plan to help them was commercial use of a financial services app, then it became a financial services app that allows commercial use with commercial using.

William Armstrong's business would have been and was an NAICS industry group 52 company. NAICS industry group 52 companies, have an average revenue of over 18 million dollars a year. More specifically, William Armstrong's business would have been classifiable as either an NAICS industry code 522320 company or an NAICS 523120 company, 522320 includes financial transactions processing et al and 523120 includes securities brokerages et al, and businesses in 522320 industry code have an average annual revenue of over 27 million dollars per establishment. There's an argument in the alternative that industry code 522320 provides a better reflection of how William Armstrong's business would have performed during its early years, whereas similar companies in 523120 provide a better view of how the businesses long term average revenue would have looked. All of this is of course stated as much as possible with reservation of plaintiffs rights or privileges for his applicable view on damages to evolve for the purposes of this lawsuit.

William Armstrong is claiming six years of lost profits related to financial services business, at a projected long term average of eight billion dollars a year. On a typical year for William Armstrong's business, the businesses revenues would have been significantly better than

86

average per industry code 522320 establishment. William Armstrong's claimed lost profits and lost business value is not just derived from the average revenue for companies in the relevant industry groups, the claimed lost profits and lost business value is based on the average revenue for companies in those industry groups if particular additional facts apply.

The prosecution is able to identify facts unique to the largest competitors in the relevant industry groups and which would have been attainable for William Armstrong's business, that would have put the business in a group with average revenues around eight billion dollars a year, with profits from that at about two billion dollars a year, or 25% of revenues. For starters, pretty much anybody who had advertised effectively and allowed commercial use had revenues upwards of a billion dollars per year in the 523120 code. There's a claim that William Armstrong's aggressive growth strategy, innovative marketing, and competitive services catering also to commercial users, would have resulted in balance sheets after 20 years being roughly in line with companies like Ally invest, and Vanguard, at current day levels of revenue, with profits at about 25% of revenue.

Adjusted for inflation at an average rate of 4.1% per year, that 8 billion dollars a year twenty years from now would be roughly equivalent to about 3 and a half billion dollars per year now. In order for William Armstrong's company to earn annual revenues today that would be equivalent to 8 billion dollars in annual revenue twenty years from now, the plaintiffs company would only need to make about three and a half billion dollars in annual revenues at this time. William Armstrong is claiming that his business would have generated 8 billion dollars a year twenty years from now, which is roughly equivalent to revenues of 3.5 billion dollars a year in

87

today's money, but for the defendants racketeering activity. In order to have those revenues in the future, William Armstrong's company only would have needed to perform a little better than average for well publicized investment apps that allow commercial use. That's one way that the plaintiff is arriving at the lost profits at 8 billion a year, for six years.

William Armstrong's business plan involved building that business with prostitutes, and advertising it with a mayoral campaign. The defendants conduct set plaintiffs business back by at least six years, two years for a pre launch period while it's developed with members of the community that the business exists to benefit and the community at large, beginning at the same time as a political campaign that would be used to generate pre-registrations and for other reasons such as training and for building the value of other assets such as goodwill for the company et al, and the soonest that could happen is 2030 because the next regular election is 2028. That's what William Armstrong would have done, and if he were to go on to develop the business that's still the plan that he believes in, is to have a pre launch period that coincides with a mayoral campaign that's used for advertising and for training and developing other assets. The election that was happening at the time of plaintiffs injury was a special election, and so with the two year advertising and training period the businesses products would have been launching around the time of the 2024 regular election, but William Armstrong's injuries including disruption to his business caused by defendant's pattern of racketeering activity did not permit him to try again during the 2024 regular election. The defendant's wrongful conduct was extremely disabling to the plaintiffs business. If the two year community development period started at the beginning of the next regular election in 2028, that would push the product launch

to two years after that. So there's effectively six lost profit years, from the time that the business would have launched its products without injury from the defendants racketeering activity, to the time that the business would even be able to launch its products while sticking to the business plan that William Armstrong believes in and which motivated him

The lost profit damages assume that William Armstrong restarts his financial services business at all following his injuries. William Armstrong has had changes in his aptitudes flowing from his injuries, and does not desire to continue in that line of work following both his injuries and the protracted period of business disruption that he was forced to suffer. William Armstrong would be able to earn money with other ventures, and so that segment of his business enterprise is likely, and in the alternative is, permanently discontinued.

For the lost profit claim, that explains the amount and the number of years. Adjusted for inflation at an average rate of 4.1%, and discounted at a 5% rate to account for growth on William Armstrong's prospective recovery at just above an extra safe treasury rate, that gives a current value of about 6.5 billion for those six years of lost profits, but actually a little bit more.

For the lost business value claim, and this claim is the more appropriate one for determining William Armstrong's damages and award, the prosecution is using an income method relying on projected future earnings. These methods also provides a basis for calculating diminished

89

business value. One method uses the 27 million that NAICS 522320 companies have on average as a benchmark representing where William Armstrong's business would have been in five years but for defendants wrongful conduct, with about 25% of that in profits, which gives about 6,750,000 in cash after expenses. Similar to the lost profits calculation, the prosecution claims that William Armstrong's business would have been in position to generate 8 billion dollars in annual revenue after twenty years, and this is based on a variety of factors. For example, Robinhood had over a million pre registrations within their pre launch period prior to officially launching, which the prosecution understands and claims to have been with nearly no advertising spending, and the prosecution believes and claims that William Armstrong's business would have had more pre-registrations, because William Armstrong's business would in some ways be a similar business, and Robinhood's past performance the prosecution thinks and claims would motivate a higher level of investment in generating pre-registrations for William Armstrong's business, in theory and as claimed that would allow Willam Armstrong's business to spend more getting pre registrations, because the retail investing element of his business is a proven business model. Also, the commercial users of William Armstrong's business would want customers, and the prosecution believes and claims that the fact of allowing commercial use would accelerate growth.

One of the models the prosecution is using for this estimate assumes 4.1% inflation with growth on cash flows that match inflation to offset it which even if actual inflation decreases that still puts William Armstrong's business at a very reasonable long term revenue growth estimate. The prosecution is estimating the value of the business in relevant part based only on the projections beyond year 20 and the part of the calculation being submitted at this time assumes the twenty

year revenue goal is met. The prosecution is estimating income starting after 20 years at 927 million representing profits at 25% on revenues of 3,708,000,000. Adjusted for inflation at 4.1% that's roughly equivalent to an annual revenue stream of about 1.65 billion today. The model assumes that half of William Armstrong's business profits are reinvested from years 20-70 earning an average compound annual growth rate CAGR of 8.69% after taxes at 21%, and then after year 70 this model assumes growth on the perpetuity at 3.2% a year, and uses a discount rate of 8.7% which includes the risk free rate combined with inflation at a rate of 4.1%. So from years 20-70 distributed profits grow at 4.1% and reinvested profits grow at 8.9%, then after year 70 all growth shrinks to 3.2%.

The growth on reinvestment projection of 8.69% is derived from the current 15 year CAGR of the nasdaq 100 index of around 16% and assumes that the CAGR stays within 75% of its current value but the number we're using is a little less than that, but also it roughly matches the 10.5% s&p 500 average since inception, it's an 11% CAGR minus 21% in taxes, and the annualized return (CAGR) for the nasdaq 100 since 1985 (39 years) as of September 11th is about 13.56%, so the nasdaq 100 40 year average supports our 75% projection during the projected time horizon.

After 20 years the business would make upwards of 8 billion dollars a year, but the claim for lost business value relies on more conservative projections. The claim for lost business value is twenty billion dollars, based on the stated assumptions and others. That segment of William Armstrong's business operations was worth at least 20 billion dollars at present day value, and the actions of the defendants destroyed that segment of William Armstrong's business.

91

William Armstrong is also seeking recovery for diminished earning capacity, and unspecified medical costs, and unspecified damages for pain and suffering and other psychological injury, and punitive damages. There are also additional business assets which would be included in the damages calculation that have not been specifically accounted for yet, including the value of good will, workforce in place, etc.

The prosecution now presents a calculation, offered as the principal basis in this complaint for deriving lost business value damages, or diminished business value damages, with reservation of rights to make adjustments.

## Model A - Two-Stage UFCF (Build -> Yield), Real Terms

**Timeline.** No cash in Years 1-20. Build runs from Year 21 through Year 20+N. The switch year is T = 20+N. From Year T+1 onward, the reinvested 'pot' pays a constant real yield y forever (no growth on that leg). The ordinary distributions (the 1-b share) may also continue, growing at g3 (optional).

**Inputs (this run).**

- Profit in Year 21 (P0): $67,500,000.00
- Reinvest share during the build (b): 90% of each year's profit (the distribution share is 10% of each year's profit).
- Build profit growth (g1): 7.5%
- Return on reinvested amounts through the switch (g2): 13.0766%

- Build length (N): 110 (switch year T = 130)

- Perpetual yield on pot after the switch (y): 3.7% (no growth on the pot leg)

- Perpetual growth on ordinary distributions after the switch (g3): 3.7% (optional)

- Real discount rate (r): 7.9%

**Equations (full model).**

- Pot at the switch (all reinvestments grown to T): $K\_T = b * P0 * (1+g2)^N * (1 - q^N) / (1 - q)$, where $q = (1+g1)/(1+g2)$.

- Ordinary distribution in the switch year: $C1\_T = (1-b) * P0 * (1+g1)^{(N-1)}$.

- PV of build-period distributions (Years 21..T): $PV\_build = ((1-b)*P0/(r-g1)) * [1 - ((1+g1)/(1+r))^N] * (1/(1+r)^{20})$.

- Terminal value at the switch (flows after T): $TV\_T = (y*K\_T)/r$ [plus, if included, $C1\_T*(1+g3)/(r-g3)$].

- Present value today (Year 0):

  $PV = PV\_build + TV\_T / (1+r)^T$.

**Exact results (real dollars, to the cent).**

- Pot at the switch (K\_T): $911,762,554,726,126.25

- Terminal value at the switch - pot only: $427,028,031,960,337.56

- Present value today - pot leg only: $21,760,485,270.98

- Present value today - post-switch ordinary leg (optional): $22,519,981.71

- Present value today - build-period distributions: $123,695,679.98

- --

- TOTAL PV (pot + post-switch ordinary + build distributions): $21,906,700,932.68

- CONSERVATIVE PV (pot-only): $21,760,485,270.98

The above calculation scales linearly with increases in the starting profits and so ten times more or less starting profits would yield ten times more or less present business value. Starting profits of $67,500,000 yields over twenty billion, which is consistent with what similar companies have earned after twenty years. William Armstrong's business would have had an after tax profit margin of at least 11.8%.

Because of the large accumulated investment due to compound growth, it may also be worth noting that if John D. Rockefeller in 1916 when he became the first billionaire, had grown a billion dollars which was the approximate value of his net worth at a compound rate of 10%, today it would be worth over 35 trillion dollars. Furthermore, at least in the alternative it's the prosecution's intention to represent the amount of the grown investment at the conclusion of the first step, in terms of basis points of total market capital, whereby if the market itself grows at an average rate of roughly 10% during the first step which historical data supports then the total market cap in the future would be much larger than it is today, and the grown investment when expressed as basis points of market cap is comparable with middle rung billionaires in today's market. In the alternative, it's claimed that the grown investment as represented in the above calculation, would be roughly 5.1 basis points of future market cap at the conclusion of the first step, and that today's U.S equity market cap is roughly 67.7 trillion, which would make a basis point in today's markets worth about 6.77 billion dollars, and therefore, the grown investment represented in the above calculation in the future markets is comparable to about 35 billion

dollars today, which although large is nonetheless reasonable over the life of a business and especially in light of historic market data and the investment plan described etc.

William Armstrong's business revenues would have been higher than average for applicable industry groups as calculated by the economic census. The prosecution is able to support claims for twenty billion dollars in lost business value and other injuries as alleged, such as injury to William Armstrong's sole proprietorships intangibles, lost opportunity, pain and suffering tied to the felt loss of the business based on how much William Armstrong would feel he's lost, etc. The present day value at the time of William Armstrong's injury was greater than twenty billion dollars using the parameters from the immediately preceding valuation equation with annual revenues of $312,500,000 at a profit margin of 11.8%, which William Armstrong's business for sure would have been earning after twenty years.

The low discount rate can be supported by converting it into an unlevered free cash flow valuation and using weighted average cost of capital as the discount rate, where the weighted average cost of capital in certain circumstances is equal to the cost of equity or alternatively the cost of debt, and it can also be discounted as an impact investment versus venture capital as I Intended to market it as an impact investment, or alternatively using a debt proxy model treating investments as low interest loans to the business allowing it to be discounted closer to corporate borrowing rates, or the low discount rate could be supported some other way.

Alternatively the applicable weighted Average cost of capital which provides the applicable discount rate is William Armstrong's cost of debt at the time of his injury using a 100% debt

95

financed model, as reflected by his interest expenses and any charges incurred while carrying debt on his credit cards, as measured against the total credit utilized over the same time period. For example, in 2021 the year of the injury, William Armstrong utilized at least $6,000 dollars in credit, which is an average five hundred dollars per month, and on his primary card incurred $78.91 in interest charges, which gives a cost of debt on the primary card of about 1.32%. At the time of his injury William Armstrong had a primary credit card and a Kohl's card as his available credit.

**Claim for punitive damages.**

William Armstrong asserts claims for punitive damages against each of the defendants.

**Additional pleadings of damages**

**Lost opportunity in the alternate. Destruction of sole proprietorships going concern in the alternate. Impairing the value of sole proprietorships other intangible assets in the alternate, or the value of the business enterprise in general. Pain and suffering commensurate with alleged money damages.**

William Louis Armstrong hereby contends that each defendant's wrongful conduct caused him to lose his opportunity to further implement his business plan, which included developing a financial services platform similar to Robinhood but also catering to commercial users and operating also as a public benefit company for the benefit of prostitutes, and advertising the aforementioned company with his candidacy for Mayor of Milwaukee.

96

In the alternative, the further implementation of the William Armstrong's business plan, with William Armstrong left uninjured as workforce in place and as a benefactor of the relevant enterprise, would have resulted in the creation of a separately organized business entity, with practically a one hundred percent certainty, and that separately organized business entity would have had a value commensurate with the lost business value damages claimed in this complaint. The lost opportunity was worth just as much as the alleged lost business value.

Furthermore, when William Armstrong set out to engage in a particular line of work, the intangible assets of his sole proprietorship gained increments in value commensurate with the value of the work that he was setting out to do and doing. When he began engaging in the specific trade and business that he was doing as part of his sole proprietorships active trade and business, his sole proprietorships going concern value gained an increment of value at least equal to the lost business value claimed in this complaint, minus no more than three thousand dollars in expenses that may have been incurred for separately organizing, but it was likely worth more as a sole proprietorship because William Armstrong could defend his business and prosecute his professional claims in court without incurring expenses to attorneys.

If when separately organized his business would have been worth a given amount, it doesn't make sense to treat his business as a sole proprietorship as worth a significant amount less for the absence of separate incorporation, because that would have been a very small expense for his business.

When the defendants pattern of racketeering activity prevented William Armstrong from continuing with his ordinary course of business, he lost the increments of value that had accrued to his sole proprietorships going concern, which corresponded to the value of his business that he was prevented from continuing.

In addition to destroying an increment in value of his sole proprietorships going concern, the defendants also destroyed increments in value of his other intangibles, including his workforce in place intangible.

William Armstrong's sole proprietorship's workforce in place intangible, before the defendants unlawful acts injuring the plaintiff, was worth some number of average companies within the relevant industry group, incorporating the relevant investment plan that William Armstrong's businesses would have implemented. The claimed lost business value is based on the value of a single company in the relevant industry group, but his sole proprietorships workforce in place intangible when he was engaged in the specific trade and business that the defendants racketeering activity has caused the discontinuance of, and really also the going concern value, was worth several companies with average revenues for the relevant industry group, at least 28 million in revenues per year per company and incorporating the relevant long term growth strategy involving index funds.

William Armstrong is claiming that his sole proprietorships intangibles were worth at least as much as the claimed lost business value damages, and is seeking recovery for at least as much as

the claimed lost business value damage, under a theory of injury to his sole proprietorships assets in the alternative.

Additionally, or in the alternate, William Armstrong is tying the claimed amount of pain and suffering damages to the claimed amount of lost business value damages or injury to intangibles. Seeking recovery in court is elective, and without taking action the natural and probable consequence of the injury would be non-recovery of the alleged money damages, pain and suffering damages commensurate with the alleged lost business value damages will naturally flow from the misconduct complained of in this complaint, William Armstrong's attempt to recover the alleged money damages also functions as an attempt to mitigate pain and suffering damages that he is suffering and will suffer in the event of non-recovery of the money damages and on account of losses. If he's unable to recover the alleged lost business value, he will still feel like he was economically injured for the amount of the lost business value claim, and he will feel like he lost his business that he feels was worth the complained of amount because of the defendant's wrongful actions and his feeling that way will be directly traceable to the tortious conduct of the defendants, and constitutes a disturbance to his workforce and a distinct disturbance to his business,. William Armstrong's argument for money damages is at least strong enough, that his feeling like his business was worth the complained of amount, and his feeling like the defendants injured him for that amount is fair, it's reasonable and fair, but even if it's less than perfectly reasonable or fair, the prosecution reserves the right to claim eggshell skull in connection with this claim and every other claim in this complaint, and with an eggshell skull the defendants are still blameworthy and he would still have these complained of pain and suffering damages and injury to his sole proprietorships intangibles relating to this unique business

99

disturbance, the defendants have to take their victim as they found them, and William Armstrong's figurative eggshell skull which the prosecution claims he has in the alternative is not a defense. At least in the alternative, William Armstrong's workforce in place lost morale at a value commensurate with the felt lost business damages, and that lost morale is an injury to the intangible.

For the purposes of default judgement William Armstrong's claimed pain and suffering damages, and claimed damages from injury to the intangibles of his sole proprietorship, and claimed lost opportunity damages, and claimed diminished earning capacity damages are (at least roughly) equal to his claimed lost business value damages and are set at $20,000,000,000 (Twenty Billion United States Dollars) and in the alternate to the lost and diminished business value damages..

**Demand for judgment**

William Armstrong demands judgment, seeking the recovery of money for injury to William Armstrong's business and property from patterns of racketeering activity in violation of the Wisconsin and federal RICO acts. William Armstrong demands treble damages under the federal RICO statute, and also double damages under the Wisconsin Rico statute. William Armstrong seeks recovery for all such damages set out in this complaint, and any such damages flowing from acts or violations described in this complaint, and all such other damages as will be proved in court. William Armstrong claims lost business value damages at a sum of at least twenty billion dollars, and seeks recovery on account of such damages under the federal and Wisconsin RICO acts for at least one hundred billion dollars. In the alternative William Armstrong seeks diminished business value money damages at a percentage of a such claimed lost business value,

100

as modified by federal and Wisconsin RICOS treble and double damages provisions. William Armstrong seeks the value of his stolen motor vehicle as money damages, multiplied by RICO double and treble damages provisions. Again, William Armstrong seeks recovery of money damages for all damages described in this complaint, and on account of all injuries described in this complaint, with all damages modified appropriately pursuant to federal and Wisconsin RICO double and treble damages provisions.

For the avoidance of any confusion the prosecution clarifies that William Armstrong is seeking recovery of one hundred billion dollars, and insofar as the prosecution can say so, that's the damages number for default judgement, in connection with lost or diminished business value, and/or any other damages to William Armstrong's business and/or property represented in the complaint William Armstrong also demands judgment of punitive damages.

**Secondary pleading of violations;**

Title 18 1962;

(a)

(b) The plaintiff William Armstrong was and is an enterprise the activities of which affected and continue to affect interstate commerce. Those predicate acts of racketeering activity which deprived William Armstrong and caused a lasting deprivation to the plaintiff of his motor vehicle constituted the acquisition and maintaining of control over the plaintiff as an enterprise.

101

At a minimum plaintiffs activities affected interstate commerce because he purchased gas for driving which was generally shipped across state lines to the point of purchase, and he used and continues to use a cellphone with services provided by companies that aren't domestic to Wisconsin, and because he wore and continues to wear clothes that were shipped from out of state while living his life and which would be replaced by other clothes also shipped from out of state including without limitation shoes that accumulated wear and tear during the conduct of plaintiffs enterprise, and because he generally used and continues to use credit cards provided by non-domestic providers, and his primary source of income is disability checks which it's claimed are financed from interstate taxes and processed using people employed through interstate transactions, etc.

Not having my own motor vehicle has a big effect on my life and business, it affects when I eat, it affects my work opportunities, it affects sexual opportunities, not having my own personal motor vehicle affects pretty much every aspect of my life, having to basically live around my access to someone else's car, or just go without dictates my schedule or makes makes everything take longer.

What they did to me is just as bad as if I had destroyed all of their machinery that they use to live and work, and they had to crush their scrap metal by hand instead of with heavy machinery. it's just as much or more so an acquisition and maintenance of control over my enterprise as if I had destroyed their machines. The motor vehicle is heavy machinery that's used to live and work, and by destroying my machines they acquired and exerted a lasting and continuing control over my enterprise.

102

(c)

The NMVTIS and DOJ are an enterprise, individually and together. Alter Trading Corporation and it's subsidiaries participated in the conduct of the NMVTIS's and Department of Justices affairs through a pattern of racketeering activity.

The very nature of the NMVTIS and the Department of Justice in connection with its operation of that system, involves a significant degree of control for participants in reporting to the NMVTIS. Participants such as Alter Trading Corporation and its subsidiaries reporting to the DOJ and NMVTIS have full control over what vehicles they obtain and report, and they have a significant degree of control over whether the NMVTIS may be useful for identifying stolen cars in order to prevent the crushing of stolen vehicles. Without their autonomous exercise of control, conducting the enterprise or otherwise participating in the conduct of the enterprise, including without limitation by transacting in motor vehicles for the reporting to even occur, the vin reports themselves which are a primary function of the enterprise would not be occurring.

The NMVTIS itself is an enterprise, and by its very nature, the reporting participants themselves have a high degree of control over the conduct of that enterprise.

Instead of using that enterprise to limit harm to victims and avoid crimes, Alter Trading Corporation and its subsidiaries along with other defendants, exploited these enterprises to

103

facilitate their crimes. For example, instead of using the system to not crush stolen cars, they hurry up to crush stolen cars hoping to claim immunity.

(d)

---

**Supplement to the legal pleadings**

The section is offered to supplement the legal pleadings from statutes, with the additional context from the pleading of predicate acts, but is not a replacement for inference from the pleading of predicate acts, and this section is illustrative not exhaustive, partly intended to facilitate screening by illustrating that de minimis standards are satisfied, and expansion is intended. In this section as a general rule enterprise names are indicated with an underline, but the inclusion by specific description of any given enterprise is not intended to exclude in its place any such enterprises which are inferable from the predicate act pleadings.


Where traceability of my injuries to a particular violation is a potential issue, the pleading is nonetheless intended to support claims conspiracy liability, where each named defendant is alleged to have conspired for themselves and their co-defendants or others to violate the racketeering laws and to profit from those violations with their co-defendants as co-conspirators. Without limitation, I'm seeking to hold each named defendant jointly and severally liable, to the fullest

extent permitted by law, including without limitation in connection with the conspiracy claims.

## Goldstein Group INC:

**Used income directly derived:** Goldstein Group INC participated as a principal in the pattern of racketeering activity described in this complaint, by directly committing, aiding, abetting, counseling, commanding, inducing, procuring, or willfully causing the commission of various acts of racketeering activity, including without limitation, by participating in procuring and willfully causing et al 2012-2020 unlicensed money transmitting by Mcc Holdings Inc, by participating in procuring and willfully causing et al 2012 Money laundering in connection with the 2012 acquisition of Miller Compressing Company by Alter Trading Corporation, by participating in procuring and willfully causing et al 2013 use of interstate facilities to facilitate possession of stolen vehicles and vehicle parts, and by participating in procuring and willfully causing et al 2019 money laundering. The Alter Trading Corporation enterprise including Alter Trading Corporation and its subsidiaries have a substantial amount of assets traceable to a pattern of racketeering activity, and Goldstein Group INC as the owner of Alter Trading Corporation inferably receives some of the income from those assets on occasion or is intended (conspired) to receive income from those assets at some point.

Additionally Goldstein Group INC received income in the form of unrealized gains as accretions to the wealth ostensibly of its subsidiaries while those subsidiaries were agents in fact for Goldstein Group INC simultaneously with others as multiple-agents, whereby receipt by the agent is receipt by the principal and income includes unrealized gains, and such unrealized gains

105

were used in the operation of a <u>self or subsidiary enterprise</u> comprised of themselves or the subsidiary as independent enterprises when the agent was thereafter used by Goldstein Group INC as the principal in the continuation of its agency.

**Invested income directly derived:** Goldstein Group participated in the <u>Alter Trading Corporation enterprise</u> pattern of racketeering activity as described above et al, and inferably the difference in Alter Trading Corporations assets traceable to the pattern of racketeering activity, occasionally trickles up to Goldstein Group INC as their shareholder and has been invested in the operation of Goldstein Group INC enterprise. Particularly the 2012 Miller Compressing Company deal was a significant acquisition that certainly would have impacted distributions to shareholders, with a lasting impact.


Additionally Goldstein Group INC received income in the form of unrealized gains as accretions to the wealth ostensibly of its subsidiaries while those subsidiaries were agents in fact for Goldstein Group INC simultaneously with others as multiple-agents, whereby receipt by the agent is receipt by the principal and income includes unrealized gains, and such unrealized gains were used in the operation of a <u>self or subsidiary enterprise</u> comprised of themselves or the subsidiary as independent enterprises when the agent was thereafter used by Goldstein Group INC as the principal in the continuation of its agency.

**Directly Acquired interest:** Goldstein Group INC directly acquired an interest in Goldstein Group Motors through the commission of use of interstate facilities to facilitate laundering altered VIN vehicles when Gold Group Motors was created for the acquisition of American Industrial Motor Services and related properties. The <u>Alter Trading Corporation enterprise</u> needs

motors for its shredders that are used to alter VIN's for committing possession of altered VIN vehicles and vehicle parts, and in order to facilitate…

**Directly Maintained interest:**

**Directly Acquired control:**

**Directly Maintained control:**

**Directly conduct:**

**Directly Participated in the conduct of:** Goldstein Group INC directly participated in the conduct of <u>American Industrial Motor Services Enterprise</u> when it facilitated the acquisition of American Industrial Motor Services for the benefit of and use by the <u>Alter Trading Corporation enterprise</u> in its pattern of racketeering activity, by acting as a holding company and creating into its own possession Goldstein Group Motors to operate as a subsidiary for the purposes of owning American Industrial Motor Services. Alter Trading Corporation had just received 143 cars in 2014, they couldn't directly acquire AIMS, they needed Goldstein Group INC to create a subsidiary to facilitate the acquisition for limiting risk.

**Used income indirectly derived:** Goldstein Group participated in the <u>Alter Trading Corporation enterprise</u> pattern of racketeering activity as described above et al, and inferably the difference in Alter Trading Corporations assets traceable to the pattern of racketeering activity, occasionally trickles up to Goldstein Group INC as their shareholder and has been invested in the operation of Goldstein Group INC enterprise. Particularly the 2012 Miller Compressing Company deal was a significant acquisition that certainly would have impacted distributions to shareholders, with a lasting impact. Income that is traceable to the <u>Alter Trading Corporation enterprise's</u> pattern of racketeering activity includes income that was derived both directly and indirectly from that pattern. Additionally Goldstein Group INC received income in the form of unrealized gains as

107

accretions to the wealth ostensibly of its subsidiaries while those subsidiaries were agents in fact

for Goldstein Group INC simultaneously with others as multiple-agents, whereby receipt by the

agent is receipt by the principal and income includes unrealized gains, and such unrealized gains

were used in the operation of a self or subsidiary enterprise comprised of themselves or the

subsidiary as independent enterprises when the agent was thereafter used by Goldstein Group

INC as the principal in the continuation of its agency.

**Invested income indirectly derived:** See above.

**Indirectly Acquired interest:**

**Indirectly Maintained interest:**

**Indirectly Acquired control:** First, Goldstein Group indirectly acquired control over the Miller

Compressing Enterprise when Alter Trading Corporation directly acquired an interest through

the procurement of unlicensed money transmitting and the commission of 2012 money

laundering in violation of section 1956, etc. Second, Goldstein Group indirectly acquired control

over William Armstrong Enterprise when their subsidiaries acquired and maintained control over

William Armstrong's machinery through the commission of various acts described in this

complaint including possession of Altered vin vehicles in violation of section 2321.

**Indirectly Maintained control:**

**Indirectly conduct:**

**Indirectly Participated in the conduct of:**



**Alter Trading Corporation:**

**Used income directly derived:** Alter Trading Corporation received income in the form of unrealized gains as accretions to the wealth ostensibly of its subsidiaries while those subsidiaries were agents in fact for Alter Trading Corporation simultaneously with others as multiple-agents, whereby receipt by the agent is receipt by the principal and income includes unrealized gains, and such unrealized gains were used in the operation of a <u>self or subsidiary enterprise</u> comprised of themselves or the subsidiary as independent enterprises when the agent was thereafter used by Alter Trading Corporation as the principal in the continuation of its agency.

**Invested income directly derived:** Alter Trading Corporation received income in the form of unrealized gains as accretions to the wealth ostensibly of its subsidiaries while those subsidiaries were agents in fact for Alter Trading Corporation simultaneously with others as multiple-agents, whereby receipt by the agent is receipt by the principal and income includes unrealized gains, and such unrealized gains were used in the operation of a <u>self or subsidiary enterprise</u> comprised of themselves or the subsidiary as independent enterprises when the agent was thereafter used by Alter Trading Corporation as the principal in the continuation of its agency.

**Directly Acquired interest:** Alter Trading Corporation directly acquired an interest in the <u>Miller Compressing Enterprise</u> when Alter Trading Corporation purchased Miller Compressing Company through the procurement of unlicensed money transmitting and the commission of 2012 money laundering in violation of section 1956, etc.

**Directly Maintained interest:**

**Directly Acquired control:** Alter Trading Corporation directly acquired control over the <u>Miller Compressing Enterprise</u> when Alter Trading Corporation purchased Miller Compressing Company through the procurement of unlicensed money transmitting and the commission of 2012 money laundering in violation of section 1956, etc.

109

**Directly Maintained control:**

**Directly conduct:** The Department of Justice and the national motor vehicle title information system, on their own and together with the people involved in the operation of that system are enterprises, and Alter Trading Corporation conducted the affairs of the <u>DOJ NMVTIS enterprises</u> when reporting ultimately to the Department of Justice on the receipt of William Armstrong's stolen motor vehicle. Scrap metal businesses that report to the department of Justice or its state partners while participating in the national motor vehicle title information system, and because of their high level of control without limitation over details such as which vehicles are obtained so as to be reported to the NMVTIS in the first place and how long those vehicles are retained and some control over when reporting happens, they can said to be conducting the affairs of the <u>DOJ enterprise</u>. The way the <u>DOJ NMVTIS enterprise</u> is even structured, involves participating scrap metal businesses having a high level of control over the affairs of the enterprise. For clarity, the way William Armstrong found his stolen car was that he ordered an online vehicle report that said that Alter Trading Corporation was the reporting entity who reported obtaining the vehicle to the NMVTIS, which is operated by the DOJ.

**Directly Participated in the conduct of:** See above at "directly conduct"

**Used income indirectly derived:** Alter Trading Corporation received income in the form of unrealized gains as accretions to the wealth ostensibly of its subsidiaries while those subsidiaries were agents in fact for Alter Trading Corporation simultaneously with others as multiple-agents, whereby receipt by the agent is receipt by the principal and income includes unrealized gains, and such unrealized gains were used in the operation of a <u>self or subsidiary enterprise</u> comprised of themselves or the subsidiary as independent enterprises when the agent was thereafter used by Alter Trading Corporation as the principal in the continuation of its agency.

**Invested income indirectly derived:** Alter Trading Corporation received income in the form of unrealized gains as accretions to the wealth ostensibly of its subsidiaries while those subsidiaries were agents in fact for Alter Trading Corporation simultaneously with others as multiple-agents, whereby receipt by the agent is receipt by the principal and income includes unrealized gains, and such unrealized gains were used in the operation of a <u>self or subsidiary enterprise</u> comprised of themselves or the subsidiary as independent enterprises when the agent was thereafter used by Alter Trading Corporation as the principal in the continuation of its agency.

**Indirectly Acquired interest:**

**Indirectly Maintained interest:**

**Indirectly Acquired control:**

**Indirectly Maintained control:**

**Indirectly conduct:** see above at "directly conduct"

**Indirectly Participated in the conduct of:** see above at "directly conduct"


## Miller Compressing Company:

**Used income directly derived:** Additionally Miller Compressing Company received income in the form of unrealized gains as accretions to the wealth ostensibly of its subsidiaries while those subsidiaries were agents in fact for Miller Compressing Company simultaneously with others as multiple-agents, whereby receipt by the agent is receipt by the principal and income includes unrealized gains, and such unrealized gains were used in the operation of a <u>self or subsidiary enterprise</u> comprised of themselves or the subsidiary as independent enterprises when the agent was thereafter used by Miller Compressing Company as the principal in the continuation of its agency.

**Invested income directly derived:** Additionally Miller Compressing Company received income in the form of unrealized gains as accretions to the wealth ostensibly of its subsidiaries while those subsidiaries were agents in fact for Miller Compressing Company simultaneously with others as multiple-agents, whereby receipt by the agent is receipt by the principal and income includes unrealized gains, and such unrealized gains were used in the operation of a <u>self or subsidiary enterprise</u> comprised of themselves or the subsidiary as independent enterprises when the agent was thereafter used by Miller Compressing Company as the principal in the continuation of its agency.

**Directly Acquired interest:**

**Directly Maintained interest:**

**Directly Acquired control:**

**Directly Maintained control:**

**Directly conduct**

**Directly Participated in the conduct of:**

**Used income indirectly derived:** Additionally Miller Compressing Company received income in the form of unrealized gains as accretions to the wealth ostensibly of its subsidiaries while those subsidiaries were agents in fact for Miller Compressing Company simultaneously with others as multiple-agents, whereby receipt by the agent is receipt by the principal and income includes unrealized gains, and such unrealized gains were used in the operation of a <u>self or subsidiary enterprise</u> comprised of themselves or the subsidiary as independent enterprises when the agent was thereafter used by Miller Compressing Company as the principal in the continuation of its agency.

112

**Invested income indirectly derived:** Additionally Miller Compressing Company received income in the form of unrealized gains as accretions to the wealth ostensibly of its subsidiaries while those subsidiaries were agents in fact for Miller Compressing Company simultaneously with others as multiple-agents, whereby receipt by the agent is receipt by the principal and income includes unrealized gains, and such unrealized gains were used in the operation of a <u>self or subsidiary enterprise</u> comprised of themselves or the subsidiary as independent enterprises when the agent was thereafter used by Miller Compressing Company as the principal in the continuation of its agency.

**Indirectly Acquired interest:**

**Indirectly Maintained interest:**

**Indirectly Acquired control:**

**Indirectly Maintained control:**

**Indirectly conduct**

**Indirectly Participated in the conduct of:**


## Seven Stars Auto Parts LLC:

**Used income directly derived:** Seven Stars Auto Parts LLC received income from a pattern of racketeering activity that they participated in as a principal, by receiving income traceable to predicate acts including without limitation their possession of William Armstrong's altered VIN vehicle with intent, 2012 and 2019 money laundering, 2012-2020 unlicensed money transmitting, and state law offenses including criminal slander of title and thefts, and thereafter used and invested that income in their own operation. One way that I'm injured by that use and investment is because they chose to use and invest funds traceable to my stolen car in their own

operation instead of divestiture or restitution leaving me without my own car for an extended period. I was also injured by their practices as influenced by the unlawful acquisitions, that is to say that their manner of doing business is influenced by whose wealth they ultimately are operating with, and making restitution for my stolen car was one thing that they were never going to do with Goldstein and Alter money, that ultimately is traceable to the unlicensed money transmitting and unlawful acquisitions, at least not without legal action.

**Invested income directly derived:** See above

**Directly Acquired interest:** Seven Stars Auto directly acquired an interest in William Armstrong's Enterprise through a pattern of racketeering activity when they bought William Armstrong's stolen car, at a minimum because their receipt of William Armstrong's stolen vehicle constituted crime in progress aiding and abetting, inducing, and willful causing Alter Trading Corporations possession of Altered VIN vehicles, and similar offenses of other defendants or third parties. Also their receipt of my stolen vehicle involved the commission in immediate connection with and in furtherance of such receipt of other offenses including without limitation, interstate transport of stolen vehicles, use of interstate facilities to promote money laundering, Armstrong property wire fraud, etc.

**Directly Maintained interest:**

**Directly Acquired control:**

**Directly Maintained control:**

**Directly conduct:** The Department of Justice and the national motor vehicle title information system, on their own and together with the people involved in the operation of that system are enterprises, and Seven Stars Auto Parts LLC conducted the affairs of the DOJ NMVTIS enterprises when reporting ultimately to the Department of Justice on the receipt of William

Armstrong's stolen motor vehicle. Scrap metal businesses that report to the department of Justice or its state partners while participating in the national motor vehicle title information system, and because of their high level of control without limitation over details such as which vehicles are obtained so as to be reported to the NMVTIS in the first place and how long those vehicles are retained and some control over when reporting happens, they can said to be conducting the affairs of the <u>DOJ enterprise</u>. The way the <u>DOJ NMVTIS enterprise</u> is even structured, involves participating scrap metal businesses having a high level of control over the affairs of the enterprise. For clarity, the way William Armstrong found his stolen car was that he ordered an online vehicle report that said that Alter Trading Corporation was the reporting entity who reported obtaining the vehicle to the NMVTIS, which is operated by the DOJ, however Bryan Downer with Seven Stars Auto Parts LLC has sworn that Seven Stars Auto Parts LLC electronically executed the bill of sale to the Wisconsin department of transportation which inferably then reported to the DOJ, so Seven Stars Auto Parts was also conducting or participating in the conduct of.

**Directly Participated in the conduct of:** See above at "directly conduct"

**Used income indirectly derived:**

**Invested income indirectly derived:**

**Indirectly Acquired interest:**

**Indirectly Maintained interest:**

**Indirectly Acquired control:**

**Indirectly Maintained control:**

**Indirectly conduct:** See above at "directly conduct"

**Indirectly Participated in the conduct of:** see above at "directly conduct"

## Alter Logistics & Transloading company:

**Used income directly derived:**

**Invested income directly derived:**

**Directly Acquired interest:**

**Directly Maintained interest:**

**Directly Acquired control:**

**Directly Maintained control:**

**Directly conduct**

**Directly Participated in the conduct of:**

**Used income indirectly derived:**

**Invested income indirectly derived:**

**Indirectly Acquired interest:**

**Indirectly Maintained interest:**

**Indirectly Acquired control:**

**Indirectly Maintained control:**

**Indirectly conduct**

**Indirectly Participated in the conduct of:**


## Quarles & Brady LLP:

**Used income directly derived:** Quarles & Brady derived income directly from their participation in the mail and wire frauds committed in the court of obtaining the Wisconsin Wrench-N-Go mark in the name of the subsidiary Seven Stars Auto Parts LLC instead of in the

name of the parent company with an identical mark. Their enterprise obviously affects interstate commerce because they were working with Alter Trading Corporation a Missouri Corporation.

**Invested income directly derived:** See above at "used income directly derived"

**Directly Acquired interest:** I'm claiming that the Goldsteins as a family group operate an enterprise of holding companies and criminal instruments.

**Directly Maintained interest:**

**Directly Acquired control:**

**Directly Maintained control:**

**Directly conduct:** Quarles & Brady directly conducted the affairs of the <u>Alter Trading Corporation enterprise</u> when it participated in leading the mail fraud, wire fraud, and associated state law violations committed in the course of obtaining the Wisconsin Wrench-N-Go mark.

**Directly Participated in the conduct of:** See above at "directly conduct"

**Used income indirectly derived:** See above at "used income directly derived"

**Invested income indirectly derived:**

**Indirectly Acquired interest:**

**Indirectly Maintained interest:**

**Indirectly Acquired control:**

**Indirectly Maintained control:**

**Indirectly conduct**

**Indirectly Participated in the conduct of:**


**All Seasons Trucking 2 LLC:**

**Used income directly derived:**

117

**Invested income directly derived:**

**Directly Acquired interest:** All Seasons Trucking 2

**Directly Maintained interest:**

**Directly Acquired control:**

**Directly Maintained control:**

**Directly conduct**

**Directly Participated in the conduct of:**

**Used income indirectly derived:**

**Invested income indirectly derived:**

**Indirectly Acquired interest:**

**Indirectly Maintained interest:**

**Indirectly Acquired control:**

**Indirectly Maintained control:**

**Indirectly conduct**

**Indirectly Participated in the conduct of:**

## Chanel:

**Used income directly derived:**

**Invested income directly derived:**

**Directly Acquired interest:**

**Directly Maintained interest:**

**Directly Acquired control:**

**Directly Maintained control:**

118

**Directly conduct**

**Directly Participated in the conduct of:**

**Used income indirectly derived:**

**Invested income indirectly derived:**

**Indirectly Acquired interest:**

**Indirectly Maintained interest:**

**Indirectly Acquired control:**

**Indirectly Maintained control:**

**Indirectly conduct**

**Indirectly Participated in the conduct of:**


## Robert Goldstein:

**Used income directly derived:** Additionally Robert Goldstein received income in the form of unrealized gains as accretions to the wealth ostensibly of its subsidiaries while those subsidiaries were agents in fact for Robert Goldstein simultaneously with others as multiple-agents, whereby receipt by the agent is receipt by the principal and income includes unrealized gains, and such unrealized gains were used in the operation of a <u>self or controlled entity enterprise</u> comprised of themselves or their controlled entities as independent enterprises when the agent was thereafter used by Robert Goldstein as the principal in the continuation of its agency.

**Invested income directly derived:** Additionally Robert Goldstein received income in the form of unrealized gains as accretions to the wealth ostensibly of its subsidiaries while those subsidiaries were agents in fact for Robert Goldstein simultaneously with others as multiple-agents, whereby receipt by the agent is receipt by the principal and income includes

119

unrealized gains, and such unrealized gains were used in the operation of a <u>self or controlled</u> <u>entity enterprise</u> comprised of themselves or their controlled entities as independent enterprises when the agent was thereafter used by Robert Goldstein as the principal in the continuation of its agency.

**Directly Acquired interest:**

**Directly Maintained interest:**

**Directly Acquired control:**

**Directly Maintained control:**

**Directly conduct**

**Directly Participated in the conduct of:**

**Used income indirectly derived:**

**Invested income indirectly derived:**

**Indirectly Acquired interest:**

**Indirectly Maintained interest:**

**Indirectly Acquired control:**

**Indirectly Maintained control:**

**Indirectly conduct**

**Indirectly Participated in the conduct of:**


## Michael Goldstein:

**Used income directly derived:** Additionally Michael Goldstein received income in the form of unrealized gains as accretions to the wealth ostensibly of its subsidiaries while those subsidiaries were agents in fact for Michael Goldstein simultaneously with others as multiple-agents,

whereby receipt by the agent is receipt by the principal and income includes unrealized gains, and such unrealized gains were used in the operation of a <u>self or controlled entity enterprise</u> comprised of themselves or related person controlled entities as independent enterprises when the agent was thereafter used by Michael Goldstein as the principal in the continuation of its agency.

**Invested income directly derived:** Additionally Michael Goldstein received income in the form of unrealized gains as accretions to the wealth ostensibly of its subsidiaries while those subsidiaries were agents in fact for Michael Goldstein simultaneously with others as multiple-agents, whereby receipt by the agent is receipt by the principal and income includes unrealized gains, and such unrealized gains were used in the operation of a <u>self or controlled entity enterprise</u> comprised of themselves or related person controlled entities as independent enterprises when the agent was thereafter used by Michael Goldstein as the principal in the continuation of its agency.

**Directly Acquired interest:**

**Directly Maintained interest:**

**Directly Acquired control:**

**Directly Maintained control:**

**Directly conduct**

**Directly Participated in the conduct of:**

**Used income indirectly derived:**

**Invested income indirectly derived:**

**Indirectly Acquired interest:**

**Indirectly Maintained interest:**

121

**Indirectly Acquired control:**

**Indirectly Maintained control:**

**Indirectly conduct**

**Indirectly Participated in the conduct of:**


**Robert G. Ellis:**

**Used income directly derived:**

**Invested income directly derived:**

**Directly Acquired interest:**

**Directly Maintained interest:**

**Directly Acquired control:**

**Directly Maintained control:**

**Directly conduct**

**Directly Participated in the conduct of:**

**Used income indirectly derived:**

**Invested income indirectly derived:**

**Indirectly Acquired interest:**

**Indirectly Maintained interest:**

**Indirectly Acquired control:**

**Indirectly Maintained control:**

**Indirectly conduct**

**Indirectly Participated in the conduct of:**

**Jon Spigel:**

**Used income directly derived:** Some portion of Jon Spigel's employment income from <u>Alter</u> <u>family of businesses</u> was derived from a pattern of racketeering activity that he participated in as a principal. During some of his employment hours he committed acts of racketeering activity in the course of his employment, including without limitation the mail and wire frauds associated with Wisconsin state law false swearing and false statements. He of course thereafter used some portion of his income in the operation of a self enterprise which affects interstate commerce.

**Invested income directly derived:** See above at "used income directly derived"

**Directly Acquired interest:**

**Directly Maintained interest:**

**Directly acquired control:** Jon Spigel by way of his willingness to engage in a pattern of racketeering activity in furtherance of <u>Goldstein racketeering family</u> business interests, obtained rank, rose through rank, and maintained rank, in the Alter family of businesses. He's been a direct participant in their racketeering pattern for over ten years. In the course of his employment he regularly controls the conduct of Alter businesses in obtaining and renewing licenses.

**Directly Maintained control:**

**Directly conduct:** John Spigel directly participated in the conduct of Alter family of businesses enterprise, and Quarles & Brady enterprise when committing the mail and wire frauds involved in obtaining the Wisconsin Wrench-N-Go mark for Seven Stars Auto Parts LLC. He participated in directing Quarles and Brady's participation, and Quarles and Brady was to some extent conducting their own enterprise when rendering legal services.

**Directly Participated in the conduct of:** John Spigel directly participated in the conduct of <u>Alter family of businesses enterprise</u>, and <u>Quarles & Brady enterprise</u> when committing the mail

and wire frauds involved in obtaining the Wisconsin Wrench-N-Go mark for Seven Stars Auto

Parts LLC. He participated in directing Quarles and Brady's participation, and Quarles and

Brady was to some extent conducting their own enterprise when rendering legal services.

**Used income indirectly derived:**

**Invested income indirectly derived:**

**Indirectly Acquired interest:**

**Indirectly Maintained interest:**

**Indirectly Acquired control:**

**Indirectly Maintained control:**

**Indirectly conduct**

**Indirectly Participated in the conduct of:**


**Types;**

**Used income directly derived: Seven Stars Auto Parts used income directly derived from**

**thefts**

**Invested income directly derived:**

**Directly Acquired interest:**

**Directly Maintained interest:**

**Directly Acquired control:**

**Directly Maintained control:**

**Directly conduct**

**Directly Participated in the conduct of:**

**Used income indirectly derived:**

124

Invested income indirectly derived:

Indirectly Acquired interest:

Indirectly Maintained interest:

Indirectly Acquired control: Goldstein Group indirectly acquired control over the Miller Compressing Enterprise when Alter Trading Corporation directly acquired an interest.

Indirectly Maintained control:

Indirectly conduct

Indirectly Participated in the conduct of:


Goldstein Group INC, Alter Trading Corporation, Miller Compressing Company, Seven Stars Auto Parts LLC, Alter Logistics & Transloading company, Quarles & Brady LLP, All Seasons Trucking 2 LLC, Chanel, Robert Goldstein, Michael Goldstein, Robert G. Ellis, Jon Spigel,


At the current time for plausibility purposes respecting title 18 section 1962 (a) I think it should suffice to allege use for self or self investment in enterprises comprised of the various defendants themselves and on their own. Anywhere that any defendant received income from the pattern of racketeering activity I'm alleging that they ultimately used it For

2580 S 34th st, Milwaukee Wi, 53215

414-248-1487

I william Armstrong hereby
Demand a dury in this action, for all claims
against all Parties, for all issues. Jury of 12,
twelve

W llem Jans ann

W William Jann amnron

126